## HARVEY SMITH v. STATE.

[59 South. 96.]

1. CRIMINAL LAW. *Objections to testimony. Witnesses. Former conviction. Explanation. New trial. Newly discovered evidence.*

It is too late to make an objection for the first time on a motion for a new trial, that a witness in a criminal prosecution was not of sufficient intelligence to appreciate the obligations of an oath.

2. WITNESSES. *Former conviction. Explanation.*

Where an accused while being examined as a witness in his own behalf testified that he had been convicted of another crime, it was not error to refuse to allow him to explain his former conviction, as this would place upon the jury the burden of retrying an issue already adjudicated.

3. CRIMINAL LAW. *New trial. Newly discovered evidence. Impeachment of witness.*

It was not error for the court to refuse to grant a new trial in a criminal case, in order to secure a witness, who would only say, that the state's witness testified falsely in giving his reasons, for writing certain letters introduced on the trial which contradicted his evidence, where the witness writing the letters admitted that the statements therein were false, as such evidence was collateral to the main purpose of the inquiry.

APPEAL from the circuit court of Monroe county.

HON. J. H. MITCHELL, Judge.

Harvey Smith was convicted of arson and appeals. For former opinion, see 58 South. 979.

The facts are fully stated in the opinion of the court.

*Leftwich & Tubb,* for appellant.

Outside of the inherent improbability of the story of Bryan Morrow and the incapacity of the witness, the record is full of contradictions. Bryan Morrow first admits telling the story to Jimmie Johnson as we have related; Lee Johnson told him that is was true and he

must stick to it; before he landed in jail but he also admits that he told sheriff Jones who arrested him and also constable Standifer who was along that he was not guilty. He told John Carter who was confined in jail with him the same thing; he wrote two letters to Mr. C. L. Tubb denying therein that he did it. In the first letter he wrote Tubb he stated that he did not burn the barn but that Lee Johnson, Cordell and others told him to stick it to Harvey Smith, and they would get him out, evidently enemies of appellant. And the second letter he again repeats, at least Johnson told him that he ought to stick to it and "they would send Harvey Smith to the pen." Mr. Tubb did not respond to his demand for an interview but without any instructions when arraigned in the court of Justice of the Peace Dalton, he solemnly stated, "I did not do it." He was then carried back to the jail, committed to the grand jury and Mr. Eikner took him home with him, and at the October term of court he went out to Boyd's and stayed with him from Saturday till Monday and went 'possum hunting, and in company with Boyd when he went out was Lee Johnson; this is a most damaging circumstance as effecting the weight to be given this child's testimony, since Lee Johnson and no doubt also Boyd were all the while belaboring the boy to stand to the story so that they could in that way vent their spleen against Harvey Smith, this appellant. While in jail, Captain J. M. Parchman went there for another purpose and attracted by the youth of the child, asked him what he was doing there, and he told him that he was not guilty. Now how does he explain all of these contradictions? Here is the explanation; that John T. Carter dictated the letter to Mr. Tubb and was directing his defense. We will refer to this feature of the case as to Carter's connection with it, later on in the brief. The letters themselves show on their very face that they are the composition of a child who was taught to write by copy at school; he misspelled Mr. Tubb's name in both

letters, writing "Tubbs;" John T. Carter who has lived in the same town with Tubb for half of his lifetime and a very intelligent and prominent man would have certainly directed the boy how to spell the lawyer's name had he dictated these letters; again, after writing his name he puts the post office address, just like any child would do, a thing that Carter would have had him to omit, had he written the letters for him to copy. These are mere surface indications, outside of the denial of Carter who could not dispute the child's statements at the trial because at the time he was confined in the penitentiary at Rankin farm for manslaughter.

Harvey Smith's supposed conviction of petty larceny shows the following:

"Q. Now, Mr. Smith, you never have been convicted of anything, have you? A. Yes, sir. Q. What? A. Why some tools they claim. Q. From whom? A. They claim the tools were taken from Ches Garner. Q. Whose court were you convicted in? A. Jim Boyd's justice of the peace, Monroe county. Q. Did you stand a trial or plead guilty? A. I stood trial, I didn't know anything about it. Q. Have you ever been convicted of anything else? A. No sir, I never have."

Now here was a clouded, delphic assault made on the good character of this appellant. Some courts have denied the right of showing the conviction of a witness of any crime as a stigma on his character save by record proof, but our courts have joined the majority in allowing the question to be put directly to the witness; in this examination above quoted, appellant showed that he was convicted without knowing anything about it and his counsel in his defense undertook to let him explain the circumstances surrounding the supposed conviction of stealing the Garner tools, when the following colloquy took place:

Re-direct examination: "Q. When you went down to Boyd's court, when you were summoned down there,

were you summoned down there as a witness? A. Yes, sir. Q. Who was charged then with this thing? Bratton: Wait a minute, I object to that. Objection sustained, to which defendant excepted.''

The court here held that when a witness is impeached by being asked about a matter collateral to the question at issue, and when questions are asked assaulting his good character, that all he can answer is yes and no, and after that, as a sheep before his shearers we must stand dumb. We submit that no such rule ought to obtain in an enlightened court. The distinguished judge simply remarked that you must stop with the proof of conviction and go no further. There may be authorities for that, but certainly the most enlightened doctrine and that most in keeping with justice and right, is the contrary. On this subject that distinguished writer on evidence, Wigmore vol. ——, section 1117, says as follows:

''After proof of a judgment of conviction may the witness be allowed to explain the circumstances of the offense, as extenuating the act and diminishing its significance? The conclusiveness of the judgment seems here to be no objection. It is true that no issue could be allowed to be joined on the witness's explanation, and thus there would be no security against false statements by him. Nevertheless, having regard to the publicity of one's discredit on the stand and the necessity of guarding against the abuses of the impeachment processes and of preventing the witness box from becoming a place of dread and loathing it would seem a harmless charity to allow the witness to make such protestations on his own behalf as he may feel able to make with a due regard to the penalties of perjury.''

We submit to the court that this single error is sufficient for reversal of this case outside of its other weakness and infirmities. The court can easily imagine how the district attorney Bratton in his closing argument

rung the charges before the jury, that the defendant was an admitted thief, convicted before a justice of the peace without appeal and, under the circumstances, how the matter was brought about, and how the defendant could have exculpated himself was all left out in the dark, because the court simply said that we could go no further; any judge who has been a trial lawyer can easily imagine the ruinous effect of such a thing in the record. It became thenceforward impossible for this appellant to have a fair and impartial trial.

*Frank Johnston,* assistant attorney-general, for appellee.

Bryan Morrow stated on the witness stand that he was fourteen years old at the time of his trial. He repeated the same statement. Prof. Greenleaf, in 1 Greenleaf on Evidence, sec. 367, states the rule of law to be on this subject, that at the age of fourteen, it is presumed, as a matter of law, that the person is competent to testify. Under the age of fourteen, the presumption is to the contrary, but no particular age had ever been fixed under fourteen where absolute incapacity arises. Children of nine, seven, and even five years of age have been found competent to testify. *State* v. *Ritchie,* 26 Am. Rep. 100; s. c., 28 La. Ann. 327. Under the age of fourteen, there is no presumption of capacity. 16 Am. & Eng. Ency. Law (2 Ed.), 267.

In *Beason* v. *State,* 96 Miss. 105, this question was not involved, but a different case altogether was presented and that was as to the incapacity of a fourteen year old boy to commit the particular crime for which he was indicted in that case. There can be no doubt about as simple a matter as the rule of law on this question. A boy of fourteen is presumed to be a perfectly competent witness, and to understand the nature of an oath. In the case of children under fourteen, this is a question of fact concerning which the trial court may make a

special inquiry. So that, upon the well settled rule of evidence and procedure in the present case, the witness being fourteen years of age and not under, there was no occasion for any examination whatever by the court as to the capacity or competency of the witness. I will observe that this objection appears in the motion for a new trial. During the progress of the trial, no suggestion was made to the court in regard to the propriety of investigating his capacity as a witness. I presume that upon an objection in this respect that the court would have examined the boy touching his capacity in this respect, if its propriety had been shown.

Certainly, in case of a witness under fourteen years of age, the defendant may require an examination of this character. *People* v. *McNair,* 21 Wend. (N. Y.) 608. But in the absence of an objection, the fact that a trial court does not make an inquiry of this character in the case of a witness under fourteen years of age would not be reversible error, unless the objection or request had been made by the defendant at the proper time in the trial. The defendant's counsel cannot be permitted to let the trial of the case proceed on the testimony of a witness even under fourteen years of age, who is apparently intelligently capacitated, and take the chances of the trial, and then on a motion for a new trial and raise the objection that this investigation, or inquiry, was not made by the court. In a case of a witness fourteen years of age, a presumption of law is in favor of his capacity and no inquiry is necessary, or required.

Argued orally by *Geo. J. Leftwich,* for appellant.

Argued orally by *Frank Johnston,* assistant attorney-general, for appellee.

COOK, J., delivered the opinion of the court.

Waiving all present consideration of the doubtful status of a second suggestion of error, we will endeavor

to make plain our reasons for affirming this case. One might reasonably conclude an affirmance without an opinion necessarily implies that the appellate court has been unable to find any error of law in the record, and, further, that the evidence warranted the finding of the jury. However, learned and ingenious counsel for appellant seem not to appreciate this logical sequence.

Appellant was convicted of arson, and it is contended that the venue was not proven, and that the ownership of the property burned was not proven as laid in the indictment. We think both the venue and ownership were clearly established by the evidence; in fact, these assignments of error were not seriously pressed, either in the briefs or oral argument. The principal witness for the state was a boy, three or four months less than fourteen years of age when he testified before the jury. One of the assignments of error complains that the trial judge allowed this boy to testify without first ascertaining that he had sufficient intelligence to appreciate the nature and binding obligations of an oath. The testimony of the boy sufficiently demonstrates the lack of merit in this point. The defendant criticises the value and weight of his testimony, but only in very rare instances are defendants satisfied with the rope which the state uses to hang them. The jury believed the boy was telling the truth, else the verdict must have been different.

Nothing was said about this testimony, or the age of the witness, before verdict; but the point was made in the motion for a new trial. If the defendant had any reason to believe that the witness was not qualified, he should have suggested this to the trial judge, either before he was permitted to testify, or by a motion to exclude his evidence. A defendant will not be permitted to play fast and loose with the court. Courts are not forums in which to test the relative adroitness and ingenuity of opposing counsel, but are organized to administer the law with fairness and impartiality.

Appellant also assigns as error the refusal of the court to permit the defendant to explain why he had been convicted of another crime, which conviction he had admitted while testifying as a witness in his own behalf. While Wigmore on Evidence suggests that the law should permit a witness so assailed to give his explanation of his former conviction, we are of the opinion that this would open up a wide field upon a collateral issue, and place upon the jury the burden of retrying an issue already adjudicated by a court of competent jurisdiction, and would tend to direct the attention of the jury from the real issue they were impaneled to try. The right to ask a witness whether he has been convicted is statutory in this state, and when the witness answers in the affirmative this ends the line of inquiry.

It is insisted that the appellant should have been granted a new trial because of newly discovered evidence. One of the lines of attack employed by defendant was to show that the boy witness had made numerous statements out of court in conflict with his evidence given in court. This witness stated to the jury that he burned the barns at the instigation of defendant for a money reward to be paid by defendant. While the boy was confined in jail charged with arson, he wrote letters to one of defendant's counsel asserting his entire innocence and knowledge of the arson. When confronted with these letters, he admitted writing them, but said he did so upon the advice of another person who was confined in the jail, and that this party dictated the letters. This party had been convicted, and was confined in the penitentiary at the time of the trial. Upon the motion for a new trial defendant made an affidavit that he could prove by this person that he did not suggest or dictate the letters, and thus contradict the boy's explanation of why he had written the letters. The affidavit of this witness was not filed with the motion, and no reason was given why it was not so produced.

102 Miss.—22.

We do not rest our opinion on the failure to produce the affidavit, because this proof was cumulative; and, besides, this witness, if he had been present at the trial, would have testified merely that the boy falsified about his reasons for writing the letters, which the boy admitted were false. The real question was, had the boy made statements out of court which were contradictory of his evidence that he burned the barns at the instigation of defendant? The letters were introduced to impeach the witness's testimony; but they were not admissible to prove the facts therein stated, and why he wrote these statements, which he testified to be untrue, was collateral to the main purpose of the inquiry. This was shown by several witnesses, and the boy admitted that he wrote the letters contradicting his evidence. We do not think the court erred in refusing to grant a new trial, in order to secure a witness who would only say that the state's witness testified falsely in giving his reasons for writing the letters which contradicted his evidence. Indeed, we think the court would have been guilty of an improvident use of judicial discretion if he had set aside the verdict of the jury for this reason alone.

We have omitted nothing of value to an understanding of the court's action in affirming this case, in response to the somewhat strenuous second suggestion of error. In conclusion, we may say that a careful reading of the record, coupled with a painstaking analysis of the arguments, leaves no doubt in our minds that we have reached the proper conclusion in this case.

*Affirmed.*