STATE *v.* SILAS LAPAN.

January Term, 1928.

Present: WATSON, C. J., POWERS, SLACK, MOULTON, and CHASE, JJ.

Opinion filed May 4, 1928.

126

*Burton E. Bailey* and *H. C. Shurtleff* for the respondent.

*J. Ward Carver*, Attorney General, for the State.

POWERS, J. The respondent was convicted of murder in the second degree. He was sentenced to life imprisonment in the State prison, and is now in execution. The victim of the homicide was Ivon Burnham, who lived alone on a farm in the town of Calais. His dead body was found in his house on the morning after he was killed, under circumstances and surroundings unmistakably indicating a most vicious and inhuman killing—the brutal and distressing details of which will be recited herein only so far as may be necessary to a proper discussion of the legal questions presented for review.

█ █ 1. Carroll Lamb was the health officer of the town of Calais and was called to the Burnham place on the morning of July 5, when the body was discovered. It appeared that his arrival there was so delayed that, in all probability, the blood found on the floor of the room where the body lay must have been clotted or dried down. He was a witnes for the State, and in his direct examination testified that in places the blood was deep enough to be dipped up with a spoon, and that he could see "liquid" blood on the floor near the fireplace. In cross-examination, he reiterated this. Whereupon, the cross-examiner asked the witness: "You still say after its taking you an hour

to get up there and assuming that that blood was spilled before Mr. Guernsey came to see you that it was still liquid blood, do you?" This question was excluded, and the respondent excepted. There was no error in this ruling. The witness had repeatedly testified that it was liquid blood and it was within the court's discretion to allow or disallow the repetition of the question. *Landry* v. *Hubert,* 100 Vt. 268, 137 Atl. 97, 100; *State* v. *Williams,* 94 Vt. 423, 434, 111 Atl. 701; *Russ* v. *Good,* 90 Vt. 236, 240, 97 Atl. 987; *State* v. *Truba,* 88 Vt. 557, 560, 93 Atl. 293. The cross-examiner also asked the witness this question : "Now if we assume that this blood was spilled on that floor before Mr. Guernsey came to see you, you still think it would be liquid blood, do you, after it had been there an hour?" This question was excluded, and the respondent excepted. The opinion of the witness on the subject referred to was wholly immaterial. He had not assumed to have or express an opinion on that subject. If, as argued, it is a matter of common knowledge that the blood would have been clotted before the witness' arrival at the Burnham place, the witness would be sufficiently impeached without reference to his opinion. Not only this, but the respondent's brief shows that the State's medical witness, Dr. Whitney, testified that human blood clots in about ten minutes. It is perfectly apparent that the respondent had the full benefit of whatever there was in this matter that would be to his advantage, if anything, and the exception is not sustained.

2. It appeared that the respondent and his brother Fred, both of whom were on the premises when the murder was committed, left there in the latter's car with the respondent sitting on the right-hand side and Fred driving. The floor board of this car was removed by an officer and delivered to Dr. Whitney, an expert chemist, who testified that he tested spots found on the side where the respondent sat for blood, and that a weak positive result was obtained. In cross-examination, it was disclosed that the test did not show whether this was human or animal blood. Thereupon, the respondent moved to strike out the testimony about it. This motion was overruled, and the respondent excepted. It later appeared that shortly before the murder, Fred Lapan's dog cut its foot and that it had ridden in this car. The floor board was offered in evidence, but being objected to on the ground that the blood found might be

that of the dog, the offer was withdrawn, and nothing was claimed for the evidence that had been admitted. As the case stood when this evidence was received, it was admissible; and the rule is that when evidence is admitted subject to exception, the excepting party in order to secure a reversal must make it appear that in the then present aspect of the case, it was inadmissible. *Foster's Exrs.* v. *Dickenson*, 64 Vt. 233, 253, 24 Atl. 253. And, on the other hand, when evidence is so excluded, the excepting party must show that in the then present aspect of the case, it was admissible. *Foote* v. *Woodworth*, 66 Vt. 216, 221, 28 Atl. 1034. In either case, subsequent events during the progress of the trial may cure any error in the ruling. Thus, the admission of evidence, legitimate when received, does not become erroneous simply because afterwards, in the course of the trial, it becomes immaterial. *Giffin* v. *Barr*, 60 Vt. 599, 601, 15 Atl. 190. So, too, error in admitting irrelevant evidence is cured by a subsequent amendment of the pleadings so as to make it admissible. *Niles* v. *Danforth*, 97 Vt. 88, 94, 122 Atl. 498. And the exclusion of legitimate evidence does not constitute reversible error, if it is subsequently admitted. *Ide* v. *Boston & Maine Railroad*, 83 Vt. 66, 95, 74 Atl. 401.

3. Dr. Whitney also testified about the blood spots on the foot-board in a way to indicate that some attempt might have been made to remove them. But, for the reasons already given, neither error nor harm resulted.

4. Among the articles used by the State as exhibits was a blood-stained glass lamp. A day or two after the murder, E. C. Comstock, a deputy sheriff, took this lamp from the Burnham house, where it was found, to his office in Barre, and had continuous and exclusive custody of the same until November 6, when he took it to Boston and delivered it to Roscoe C. Hill, of the Massachusetts Bureau for Identification of Criminals. According to Comstock's testimony, it was then in the same condition as when he took it. He testified as a witness for the State that on July 7 he took two imprints of a part of the palm of the respondent's right hand. These imprints, he said, were taken to Boston with the lamp and delivered to Mr. Hill. They were produced at the trial. When Comstock was asked if they were correct imprints, objection was made on the ground that it had not appeared how they were taken. Whereupon, the Court remarked that "it is a generally recognized

science if properly taken. We will assume they are correct."
It is altogether probable that what the court said was, "It is a
generally recognized science. If properly taken, we will assume
they are correct." But this Court cannot ignore the transcript,
even in the matter of punctuation, and must take it as it reads.
See *Wilson* v. *Barrows,* 96 Vt. 344, 346, 119 Atl. 422. To so
much of the statement as referred to its being "a generally rec-
ognized science," the respondent excepted. No ground of ex-
ception was then specified, and the only one here urged is that
no evidence had been given "as to the state of this so-called
science." No such evidence was required. The subject is one
of the things that does not have to be proved. That the system
of finger print identification rests upon a substantial scientific
basis, and that it is in general use in criminal trials, are facts of
which courts take judicial notice. *People* v. *Jennings,* 252 Ill.
534, 96 N. E. 1077, 43 L. R. A. (N. S.) 1206, 1212; *Lamble* v.
*State,* 96 N. J. Law, 114 Atl. 346, 348. See, also, *Moon* v. *State,*
22 Ariz. 418, 198 Pac. 288, 16 A. L. R. 362, 367, wherein *People*
v. *Jennings* is quoted on this point with apparent approval, and
*Parker* v. *The King* (Vict. S. C.), 3 B. R. C. 68, 69, wherein it
is said that a finger print is in reality, an unforgeable signature
—the doctrine of which was approved by this Court in *Davis* v.
*Dunn,* 90 Vt. 253, 259, 98 Atl. 81, Ann. Cas. 1918D, 994. This
knowledge of the courts goes so far as to enable them to say,
without proof, that the imprint of the palm side of the human
hand, when fairly taken, presents reliable, individual, and un-
changing characteristics of the papillary ridges; and that when
these are correctly read and interpreted by one skilled in the
science, they afford valuable evidence on questions of identity.
To the assumption of the court that the prints in question were
correct, no exception was taken.

5. In his direct examination, Officer Comstock testi-
fied that he took some finger prints, as well as palm prints, of
the respondent's hand. So far as the *finger* prints are con-
cerned there was no further reference to them in the direct ex-
amination. They were not produced in court, nor was any-
thing claimed for them. In cross-examination it appeared that,
having dusted the lamp with a gilt powder, the witness com-
pared the respondent's finger prints with prints on the lamp
then distinctly showing, using as an aid a magnifying glass,
which he produced. And that as a result of this comparison, he

made the palm prints above referred to. It was admitted that these finger prints could not be seen by the naked eye. In cross-examination he was asked if he compared the respondent's finger prints with the print on the lamp; if the prints showed distinctly; and if it was not for the reason that the lamp showed no distinct prints that he took the second prints—the palm prints. All this unmistakably shows that both cross-examiner and witness were confining their attention to the finger prints, and making no reference to the palm prints. This further appears from the fact that the court allowed this line of cross-examination on the ground that it bore ''upon the reason for his taking the second (palm) print and justifies him in so doing, but for no other reason, no other purpose whatever,'' to which the respondent's counsel assented. In further cross-examination, the witness was asked, ''Can you see the print now with it,'' meaning, of course, the finger print on the lamp, with the aid of the magnifying glass. The State objected, the question was excluded, and the respondent excepted—but as the brief does not cover this exception, we take no time with it. Then the respondent asked leave to allow the jury to examine the lamp with the glass that they might ''see that there are no prints on it.'' This was refused, and the respondent excepted. Two things are apparent: 1. The reason for taking the palm prints was of no importance in the case; 2, the only purpose of exhibiting the lamp to the jury was to discredit the witness.

 It is a salutary and well-established rule that a witness cannot be impeached upon a collateral issue. Issues are collateral which are not relevant to the issue being tried; and relevancy depends upon whether the matter in question would be admissible, as evidence on that issue. *Niebyski* v. *Welcome*, 93 Vt. 418, 421, 108 Atl. 341. There was nothing, either by way of evidence or claim, that any finger prints on the lamp were those of the respondent. No matter how many others had handled this lamp, evidence of the fact, unless in some connected with the crime charged, would be inadmissible on the question of the respondent's guilt. Having gone into a matter entirely collateral to the issue, the respondent could not impeach the witness by showing the fact to be otherwise than as he testified. *Comstock's Admr.* v. *Jacobs*, 84 Vt. 277, 283, 78 Atl. 1017, Ann. .Cas. 1913A, 679; *State* v. *Long*, 95 Vt. 485, 492, 115 Atl. 734.

6. J. W. Toelkin, of Boston, an expert finger print reader and photographer, was a witness for the State. He testified that he found a print on the lamp, of which he made an enlarged photograph, which he produced. He also made and produced an enlarged photograph of the respondent's palm prints taken by Officer Comstock. When the witness was asked if he found a print on the lamp, the respondent objected on the ground that the lamp would show for itself, and excepted to the witness' use of a magnifier. There was no evidence that he found the print by the use of a magnifier; the only evidence of the use of such an instrument was the statement of the witness regarding the photographs. The respondent treats this as being like his attempt to have the jury use the glass as above set forth. But it is obvious that the two matters were wholly unlike. This exception is not sustained.

7. This witness was asked in direct examination if he had an opinion as to whether his enlargement of the print on the lamp and the palm print made by Officer Comstock were prints of the same hand, and he replied that he had. He was then asked what that opinion was, and he replied to the effect that they were made by the same hand. All this was subject to the respondent's exceptions based upon the claim that the respondent had had no opportunity to test the witness' qualifications as an expert, and that there was no evidence to show that the photographs were properly made. There is no merit in these claims. The transcript shows that the fullest opportunity was afforded the respondent to test the question of the witness' qualifications. Nothing was elicited that required the court to exclude him as an expert witness. Indeed, there was little to shake one's confidence in the soundness of his conclusions. At most, it can only be said that the cross-examination resulted in bringing out certain things that were for consideration by the jury in weighing his testimony. It was not necessary for the State to show how the enlargements were made. It was enough for the State to do to give evidence, as it did, tending to show that the photographs and enlargements were correct representations of the prints. *Davis* v. *Dunn,* 90 Vt. 253, 260, 98 Atl. 81, Ann. Cas. 1918D, 994. The question of their admissibility then became one for the court. *Hassam* v. *Safford Lumber Co.,* 82 Vt. 444, 449, 74 Atl. 197; *Leland* v. *Leonard,* 95 Vt. 36, 38, 112 Atl. 198. The fact that the witness was allowed, before he was

cross-examined, to say that he had an opinion on the main question is of no consequence. No harm from this is suggested or indicated. The claim that the form of the question was such as to imply that his opinion was that the enlargements were of prints made by the respondent's hand was not made below, and is not considered. We may say, however, that it is apparent that both court and counsel then understood that the question only called for an answer showing that the witness had an opinion without intimating what that opinion was.

8. This witness testified in cross-examination that a certain spot on the enlargement of the print on the lamp was a ridge ending or characteristic, and not a powder spot such as was shown elsewhere thereon, and that he made a microscopic examination of the same, but that he did not bring that with him. He was asked why he did not bring it with him, and he answered that it was not necessary; and in reply to another question, his answer was that in his opinion it was not necessary because he knew the spot was a ridge characteristic. He was then asked, ''Why wasn't it necessary to bring it here to convince somebody else that it was a ridge characteristic?'' This was excluded and the respondent excepted. Counsel for the respondent say in their brief that the court took it upon itself to protect the witness from a too severe cross-examination. The transcript refutes this charge. After the ruling was made, the cross-examiner was allowed to further inquire as to the reasons why the witness did not bring with him the results of his microscopic examination, and to press the matter until the witness admitted that he had said all he cared to on that subject. It unmistakably appears, not only that the court did not protect the witness any further than he deserved protection, but that it allowed the cross-examination to proceed quite as far as was necessary to secure the respondent's rights and to protect his interests.

9. Subject to the respondent's exception, this witness testified, in answer to questions asked by the court, to the effect that, by the universal experience in this science of finger print identification, from nine to twelve common characteristics are treated as a positive identification, and there was no case of error where from seventeen to twenty such were found. In reply to cross-questions, the witness admitted that all he knew about the universal experience was what he had learned

from other experts and what he had read on the subject, but that these agreed. It is now insisted that the questions of the court resulted in getting prejudicial hearsay into the case. However this may be, the question argued is not saved. No grounds of objection to the questions propounded by the court were specified. It is a familiar rule of general application that this Court will consider only those questions that are brought here by such an exception as reasonably indicated to the trial court the ground on which the excepting party relies in asking for the ruling contended for. *Morgan* v. *Gould,* 96 Vt. 275, 279, 119 Atl. 517; *State* v. *Marino,* 91 Vt. 237, 242, 99 Atl. 882. So it is that a general objection to offered evidence cannot afford a basis for a valid exception to its admission. *Patterson's Admr.* v. *Modern Woodmen of America,* 89 Vt. 305, 315, 95 Atl. 692; *Brown* v. *Vermont Mutual Fire Ins. Co.,* 92 Vt. 272, 275, 102 Atl. 1042; *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 128, 130 Atl. 758; *Landry* v. *Hubert,* 100 Vt. 268, 137 Atl. 97, 100.

10. The above-mentioned Roscoe C. Hill was a witness for the State. He qualified as an expert finger print reader, and gave it as his opinion that the enlargment of the palm print on the lamp and that of the palm print made by Comstock were made by the same hand. He testified in cross-examination that had there been kerosene oil on the lamp, it might aid in taking the impression of the hand. The witness was then asked by the cross-examiner to take a print of the latter's finger in kerosene oil and see what it would do to a certain characteristic thereon. This was excluded, and the respondent excepted. Error does not inhere in this ruling. The matter was addressed to the administrative function of the court. What the cross-examiner asked for was to try an experiment before the jury for the purpose of discrediting the witness. It was within the discretion of the trial court to admit or exclude it. *Ide* v. *B. & M. R. R.* 83 Vt. 66, 98, 74 Atl. 401; *Thornhill* v. *Carpenter-Morton Co.,* 220 Mass. 593, 108 N. E. 474, 492; *Landro* v. *Gt. Northern Ry. Co.,* 117 Minn. 306, 135 N. W. 991, Ann. Cas. 1913D, 244, 245. Then, too, the dissimilarity of conditions justified the rejection of the experiment under the rule applied in *Hardwick Sav. Bk. & Tr. Co.* v. *Drenan,* 72 Vt. 438, 440, 48 Atl. 645.

11. Charles H. Baker, a corporal in the United States Army Medical Corps, was a witness for the respondent. He qualified as an expert finger print taker, but not as a finger

print reader. He was shown the enlarged photograph of the palm print on the lamp and asked if the impression on the lamp was a good print or a poor one. This being objected to the respondent offered to show that the imprint on the lamp as enlarged and shown by the photograph mentioned was "a poorly taken impression on the lamp." This was excluded, by a statement of the court as follows: "I will exclude this question from this witness. The court finds he is not qualified to express any such opinion." Whereupon, the respondent's counsel said, "To that finding we save an exception," to which the court assented. The brief treats this as an exception saved to the exclusion of the offer; but obviously it was an exception to the finding as to the witness' competency to speak as an expert, which was a question addressed to the court's discretion, and not reviewable. *Congdon* v. *Torrey,* 95 Vt. 38, 42, 112 Atl. 202; *Holbrook Grocery Co.* v. *Armstrong,* 97 Vt. 197, 203, 122 Atl. 458; *Rutland Sash & Door Co.* v. *Gleason,* 98 Vt. 215, 221, 126 Atl. 577. The well-known exceptions to this rule do not here apply.

　　12. The respondent was a witness in his own behalf. As unfavorably affecting his credibility, the State was permitted to show that he had been convicted of the crime of a breach of the peace. To meet this, the respondent offered evidence tending to show that his offense was of a technical and trivial character. This was excluded, and he excepted. The general rule is that when a witness' credibility is assailed he may meet the attack by giving evidence to repel the inference of unreliability and to establish his good character in that respect. *Mosley* v. *Vt. Mutual Fire Ins. Co.,* 55 Vt. 142, 153; *Stevenson* v. *Gunning's Estate,* 64 Vt. 601, 609, 25 Atl. 697. When a witness is discredited by a showing that he pleaded guilty to a criminal charge, it is proper, as bearing upon the effect to be given to this fact for him to show the circumstances and conditions under which the plea was entered. *McKinstry* v. *Collins,* 76 Vt. 221, 227, 56 Atl. 985; *Russ* v. *Good,* 90 Vt. 236, 239, 97 Atl. 987. But, in order to sustain this exception, we must go a long step further than these cases carry us. It may be argued with much force that a breach of the peace covers offenses of such a wide range of culpability that in fairness to the respondent he should have been allowed to explain the nature of the particular offense of which he was convicted, in order that the jury might have been the better enabled to determine to what

extent, if any, the conviction impaired his credibility as a witness. This view finds some support in the cases. See *Remington* v. *Judd*, 186 Wis. 338, 202 N. W. 679, 680; *Thompson* v. *Bankers' Mutual Casualty Co.*, 128 Minn. 474, 151 N. W. 180, Ann. Cas. 1916A, 277, 278. But the adoption of the rule contended for by the respondent would involve serious administrative difficulties. Of course, if it was open to the respondent to give in evidence the details of the offense, it would be equally open to the State to give counter evidence on that subject. A practical retrial of the charge might have resulted. It is easy to conceive a case in which several such collateral issues would have to be tried out. Take this very case: Fred Lapan, when on the stand, admitted no less than four convictions in one court of breaches of the peace. Here, then, would be five distinct issues to confuse the jurors and divert their minds from the real issue before them. The case is one where logic should give way to expediency; and we hold that the ruling was without error. In this result, we are sustained by what we regard as the best-reasoned decisions. In *State* v. *Abdo*, 165 Minn. 440, 206 N. W. 933, 934, it was held that the State, for impeachment purposes, could show that the respondent had been convicted of crime, but that it was not proper to go into the details thereof. *State* v. *Mount*, 73 N. J. Law, 582, 64 Atl. 124, 125, is much to the same effect, as are *Latikos* v. *State*, 17 Ala. App. 655, 88 So. 47, 48, and *Smith* v. *State*, 102 Miss. 330, 59 So. 96. The very question was before the court in *Lamoureaux* v. *New York, N. H. & H. R. R. Co.*, 169 Mass. 338, 47 N. E. 1009, wherein Justice Holmes, speaking for the court, says: "The plaintiff, in cross-examination of one of the defendant's witnesses, put in a conviction of crime to discredit him. * * * Upon redirect examination, the witness was asked to state the circumstances, the evidence being offered to show the extent of the wickedness involved in the act, and to show the circumstances. This evidence was excluded. Logically, there is no doubt that evidence tending to diminish the wickedness of the act, like evidence of good character, which is admissible, does meet, as far as it goes, the evidence afforded by the conviction, since that discredits only by tending to show either general bad character, or bad character of a kind more or less likely to be associated with untruthfulness. * * * Nevertheless, the conviction must be left unexplained. Obviously, the guilt of the witness cannot be

retried. * * * * It is equally impossible to go behind the sentence to determine the degree of guilt. Apart from any technical objection, it is impracticable to introduce what may be a long investigation of a wholly collateral matter into a case to which it is foreign, and it is not to be expected or allowed that the party producing the record should also put in testimony to meet the explanation ready in the mouth of the convicted person. Yet, if one side goes into the matter, the other must be allowed to also.'' We are quite content to adopt this as a correct statement of the law.

13. Dr. Whitney, who performed the autopsy on the murdered man, testified that he found several ribs broken, and that they could not have been broken except by being jumped upon. The respondent testified that at one time during the fracas, his brother, Fred, had Burnham down on the floor and had his knee on the latter's breast. Counsel for the respondent offered to show by him that Fred had a habit of fighting with his feet; and he excepted when this was excluded. Evidence of a personal habit is often of probative value and is frequently admitted as evidence. But in the absence of special relevancy and ''forensic necessity,'' as Chamberlain puts it, it is to be rejected. Chamb. Ev. § 3198. Ordinarily, it cannot be proved that a person did a particular thing on one occasion by showing that he did it at another time or times. *State* v. *Wilkins,* 66 Vt. 1, 12, 28 Atl. 323; *Scott* v. *Bailey,* 73 Vt. 49, 51, 50 Atl. 557. *Farnham & Sons* v. *Wark,* 99 Vt. 446, 450, 134 Atl. 603; Elliott Ev. § 157. The rejected evidence came within the rule and not the exception, and was properly excluded.

14. It appeared that an inquest had been held at the Burnham place just after the murder, and that the respondent there testified. In his cross-examination at the trial under review, he admitted that he testified falsely at the inquest in many instances which covered matters of such a character that his misstatements could be nothing less than deliberate perjury. Referring to this false-swearing, counsel for the respondent argued to the jury as follows: '' * * * Suppose we come right down to brass tacks and say they both lied up there. Does that clear away any reasonable doubt that exists in this case? Does that overcome any presumption of innocence which surrounds my client? Does it make Fred Lapan's any more reliable, the fact that his brother may have lied also just as he did? Now,

gentlemen, consider what kind of a proceeding this was—an inquest held up there at the Burnham house, conducted in an informal manner, not as this court is conducted.'' Objection being made, the arguing counsel claimed the right to argue the common knowledge regarding it, and when it was ruled that this was improper, he excepted. Assuming that this ruling was erroneous, it does not appear that the respondent was harmed by it. For aught that appears, counsel had gone as far on this subject as he intended or desired; the contrary is not asserted. To find error, we will not assume that something was left unsaid on account of the ruling. The jury was not instructed to disregard the argument already made, and it is apparent, we think, that the respondent had the full benefit of whatever there was in the point referred to.

15. The court charged the jury, in effect, that the respondent might be found guilty if he acted in concert with his brother, or aided and abetted him in the killing. In one form or another this instruction was several times given. The respondent excepted to it in its various forms. But the only ground specified was that there was no evidence warranting it. The law invoked by the respondent is sound. It is error to submit a question that is not supported by evidence. *Smith* v. *Central Vermont Ry. Co.*, 80 Vt. 208, 219, 67 Atl. 535; *Place* v. *Grand Trunk Ry. Co.*, 83 Vt. 498, 501, 76 Atl. 1110. It is true that so far as oral testimony goes, there is much to deny any concert of action between the Lapans and little to support it. Each testified fully. Fred exculpated himself, and put all the fighting onto the respondent. The respondent denied any participation in causing Burnham's injuries, and put all the fighting onto Fred. Each was very much discredited as a witness. One or the other or both killed Ivon Burnham. The circumstances were such that a jury might reasonably reject so much of the testimony of these witnesses as amounted to self-exculpation, and conclude that both participated in the attack on Burnham. The conditions found in the house; the confusion; the quantity and distribution of blood; the broken furniture; the terrible injuries inflicted on the murdered man; the joint attempt to wash up the victim; their going to the cellar together after the murder; their return to the respondent's together; their talk of flight to Canada together; their concerted lying at the inquest—these are some of the circumstances

that indicated with more or less force that the two men made common cause in the awful work of the day; or to put it in the expressive language of the State's brief, that the murder of Ivon Burnham was no one-man job.

The court charged the jury that there was no evidence to warrant an inference that Fred Lapan testified under a promise of any favor by the authorities, to which the respondent excepted. The only evidence now relied upon in support of this exception is that showing that Fred expected to be released after signing his original statement. But even this was not called to the attention of the court when the exception was taken. This should have been done if it was considered to be of enough consequence to make the instruction erroneous. It comes within the pregnant language of Judge Haselton in *Re Bean's Will*, 85 Vt. 452, 454, 82 Atl. 734, 740: "After the close of the charge, the conference between the lawyer at the bar and the lawyer on the bench as to claimed errors in the charge ought to be frank and unreserved, to the end that the presiding judge may correct or amplify the charge as upon reflection he may desire to, and that no question may be brought to this court except those upon which the county court has had a fair opportunity to pass judgment." Not only did Fred Lapan testify that he had not been promised anything, but the circumstances are wholly insufficient to indicate the contrary. That he expected to be released does not, in the circumstances, afford evidence that he was promised by the authorities a release or anything else. *State* v. *Fairbanks*, 101 Vt. 30, 139 Atl. 918, 921.

There was no error in the charge respecting the effect of the testimony of Fred Lapan, if believed by the jury. They were instructed in plain and express terms that in order to have this testimony warrant a verdict of guilty, they must be satisfied of its truth beyond a reasonable doubt; and that the question of guilt or innocence was wholly and exclusively for their determination.

Nor was there any error in the court's refusal to comply with the jury's request that they be informed as to the maximum penalty for manslaughter. Inasmuch as the court alone was to fix the penalty within the terms of the statute, G. L. 6801, the jury were correctly instructed that they had nothing to do with the penalty and that it should not enter into

their consideration or discussion. *People* v. *Williams,* 218 Mich. 436, 188 N. W. 403, 404; *State* v. *O'Meara,* 190 Iowa, 613, 177 N. W. 563, 569; *Hogg* v. *State,* 18 Ala. App. 179, 89 So. 859 860; *Williams* v. *People,* 196 Ill. 173, 63 N. E. 681, 683; *Zell* v *State,* 189 Ind. 433, 127 N. E. 1, 2, 9 A. L. R. 336.

*Judgment that there is no error in the proceedings and that the respondent takes nothing by his exceptions.*