## State of Vermont v. Chancy B. Smith, Jr.

[485 A.2d 124]

No. 83-109

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed September 7, 1984

Motion for Reargument Denied November 2, 1984

124

*John A. Rocray*, Windham County State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Paul S. Berch*, Public Defender, Brattleboro, for Defendant-Appellant.

**Gibson, J.** Defendant was convicted by jury verdict of sexual assault, 13 V.S.A. § 3252, and of carrying a weapon openly while committing a felony, 13 V.S.A. § 4005. He appeals from the judgment of the District Court of Vermont, Unit No. 1, Bennington Circuit, and raises six issues for our review: (1) whether the loss of certain evidence violated his due process right to a fair trial; (2) whether the trial court's instructions to the jury regarding the lost evidence were erroneous; (3) whether the State's failure to produce defendant's file from the Department of Corrections in a timely manner requires a new trial; (4) whether the court erred during voir dire of the jury when it denied defendant's request for an additional peremptory challenge; (5) whether the court inadequately addressed the issue whether defendant's statements to the police were voluntarily given; and (6) whether the trial court improperly limited defense counsel's cross-examination of the complaining witness. The judgment is affirmed.

During a heavy downpour on the afternoon of June 22, 1981, the complaining witness stopped her car and picked up defend-

ant who was standing at the side of Route 30 near West Dummerston, Vermont. He was holding a very young deer in his arms and indicated that he was going to Jamaica. Upon reaching Jamaica he asked the complaining witness to drive him to his home because he did not want to be seen carrying the fawn about town. The witness, after some discussion, reluctantly agreed. Defendant directed her across a bridge and onto a poorly maintained road. Because the quality of the road deteriorated rapidly, the witness stopped the car and announced that she would go no further. Defendant, however, did not get out and, instead, reached over to turn the car off and take the keys. He asked whether she wanted "to get it on" and when the witness answered negatively, he pulled a gun either from a pocket or from under the fawn he was still holding.

The witness testified that she repeatedly attempted to dissuade defendant and to negotiate her release. Defendant, however, ordered her to "get undressed." The witness, afraid for her life, submitted on the condition that he would let her go and would throw away the gun. The assault took place within the witness' vehicle. Defendant then retrieved the fawn from the back seat and left the car. The witness drove immediately to the nearby Mountain Valley Health Center, reported the assault to police and underwent a physical examination.

Defendant was identified from the victim's description and from the fact that he was later seen still carrying the fawn. He was picked up the following day and taken to the station where he signed a written form waiving his *Miranda* rights. Defendant admitted that intercourse took place but maintained that the witness consented. He also maintained that it took place outside, on some rocks or near a swimming hole, and not in the car as the witness had reported.

## I. *Lost Evidence*

At the health center, following the assault, the complaining witness underwent an examination and certain tests routinely given to assault victims. A sample of vaginal fluid was taken; it showed the presence of motile sperm. In addition, other evidence was collected from the victim to be analyzed in the police

crime laboratory. This evidence included, among other things, fingernail scrapings and foreign material found in the pubic area.

The examining physician testified that the witness' fingernails appeared clean but he nonetheless scraped them over a standard mailing envelope held open by his assistant. He also testified that he found "a very minimal amount of foreign material" in the pubic area—"about the amount that is punched out in one of the perforations of a postage stamp . . . ." He also testified that he could not identify the material. When the sealed envelopes were later opened at the police laboratory they were both empty.

Defendant contends that the loss of this evidence deprived him of a fair trial because it was exculpatory and would have enabled him to refute the complainant's story. He contends the foreign matter may have been bark or lichen, which would indicate the act took place outside the car rather than within, as the witness maintained.

This claim is directly controlled by our recent decision in *State* v. *Bailey,* 144 Vt. 86, 92–97, 475 A.2d 1045, 1048–52 (1984). In that case we indicated that such a loss will be evaluated using " 'a pragmatic balancing' of three factors: (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial." *Id.* at 95, 475 A.2d at 1050 (paraphrasing *United States* v. *Bryant,* 439 F.2d 642, 653 (D.C. Cir. 1971)).

Following *Bailey, supra,* we must first determine whether there is a reasonable possibility the lost evidence would have been favorable to the accused. *Id.* at 94, 475 A.2d at 1050. The fingernail scrapings and small bit of foreign matter may have been favorable to defendant had it been tested. At a pretrial deposition, the physician stated that "there was one small piece, perhaps two millimeters square, of what appeared to be bark or vegetable substance on pubic hair" and that "it could well have been lichen." At trial, this same witness could not remember and said he would not venture a guess as to what the material had been. If the material had indeed been of vegetable origin, it might have been useful to corroborate defendant's story that the act occurred outside of the car.

Having crossed this threshold, we next balance the three factors enumerated in *Bailey, supra.* First, we must determine the degree of negligence or bad faith on the part of the State.

The State's duty to preserve evidence obviously arises only if the State has possession of it. Cf. *Deberry* v. *State*, 457 A.2d 744, 749 (Del. 1983). In this case an examining physician, contacted independently by the complainant, administered the examination. It is clear from expert testimony that the evidence collected by the physician was not secured by means of a pharmaceutical fold or placed in a glassine envelope or vial as is customary practice. Instead, the small bits of evidence were dropped into a standard mailing envelope, from which they could have escaped. We also have no proof that the evidence was actually within the envelope when it was sealed. Additionally, the evidence may have escaped before the officer arrived and while the envelope was carried about in the assistant's laboratory coat pocket.

Although negligent handling of evidence by police officials may be imputed to the prosecution, *Freeman* v. *State*, 599 F.2d 65, 69 (5th Cir. 1979), *cert. denied*, 444 U.S. 1013 (1980), we cannot say that the physician who was contacted here was part of the prosecution team so that any negligence on his part may be imputed to the State.

The State, however, is not absolved from all liability. The officer who retrieved the envelopes took no steps to secure further the evidence—for instance, by inserting the envelopes into another container. Trial testimony established that internal police manuals instruct law enforcement officials on the proper collection of evidence. Because it is possible that the piece of evidence escaped while in the custody of the police, there may be some small degree of negligence on their part.

Second, we must examine the importance of the lost evidence. Even assuming the evidence was vegetable matter of some kind, we cannot find that it was crucial to the defense. Although it could have been used to corroborate defendant's version of events, there is no assurance that the tiny bits of material could be linked solely to the incident in question. More importantly, testimony established that heavy rains occurred that afternoon. The nurse testified that there was nothing

notable about the condition of the victim's clothes. She testified, "Her clothing looked okay. I checked her clothing." The defense presented no other evidence of any kind, such as mud in the car, or upon the victim's body that would also have corroborated defendant's story. Although the bit of evidence may have been relevant, we do not feel that it was "crucial to defendant's case." *State* v. *Bailey, supra,* 144 Vt. at 96, 475 A.2d at 1051.

The last factor for our consideration is whether this evidence, if exculpatory, would have created a reasonable doubt that did not otherwise exist. *Id.* at 96–97, 475 A.2d at 1051. Although the only evidence of defendant's guilt was the victim's testimony—the defendant did not take the stand—we cannot say that the evidence, even if exculpatory, would have created a reasonable doubt as to defendant's guilt. We reach this conclusion for two reasons. First, the evidence was not relevant to the central issue in the case—whether or not the victim was *forced* to engage in sexual intercourse with the defendant. Second, even if before the jury, it was not strong corroborative evidence of defendant's story; the particle of evidence could not have been conclusively linked to the incident in question.

■ On balance, we have no hesitation in holding that the degree of prejudice sustained by defendant as the result of the State's misconduct was insufficient to show that his constitutional right to a fair trial was infringed.

## II. *Jury Instructions*

The court instructed the jury that "if you find the State has lost certain evidence, you should then decide whether or not on each Count the State has met its burden of proof. As to the effect of the loss of fingernail scrapings or of the particle or particles of matter from [complainant's] pubic hair, you must consider all the other evidence in the case as well."

The defense alleges that under *People* v. *Zamora,* 28 Cal. 3d 88, 615 P.2d 1361, 167 Cal. Rptr. 573 (1980), defendant was entitled to a special jury instruction as to the lost evidence. Counsel requested the jury be instructed that they might infer that the lost evidence would be favorable and that its loss alone might create a reasonable doubt as to defendant's guilt. His requests were denied.

In *People* v. *Zamora, supra,* and similar cases finding that the loss of evidence constituted a due process violation, courts have not hesitated to impose various remedies ranging from outright dismissal to remand with direction to give special jury instructions. See generally Comment, *Judicial Response to Governmental Loss or Destruction of Evidence,* 39 U. Chi. L. Rev. 542 (1972).

In *Zamora, supra,* the California Supreme Court found the wholesale destruction of records of citizen complaints against police officers by the Los Angeles City Attorney's office violated that defendant's due process right to a fair trial. 28 Cal. 3d at 104 n.11, 615 P.2d at 1370 n.11, 167 Cal. Rptr. at 582 n.11. The defendant, accused of assaulting an officer, required the complaints to defend himself. In order to assure the defendant a fair trial, *id.* at 99, 615 P.2d at 1368, 167 Cal. Rptr. at 580, and "to deter prosecution attempts to defy or circumvent judicial authority," *id.* at 96, 615 P.2d at 1366, 167 Cal. Rptr. at 578, the court reversed and remanded with directions to instruct the jury that complaints against the officers had been destroyed, that the officers had used excessive force on those reported occasions, that the officers were prone to use excessive force and that their testimony regarding such incidents may be biased. *Id.* at 102–04, 615 P.2d at 1370, 167 Cal. Rptr. at 582.

Because we have already decided that defendant's due process rights to a fair trial were not violated by the loss of evidence in this case, it was not necessary for the trial judge to give a *Zamora* instruction.

■ In order to find defendant guilty, the jury was instructed that they must have other adequate evidence on each count apart from the missing evidence. This was all that was required. There was no abuse of discretion in the trial court's denial of the requested *Zamora* instruction.

### III. *Production of Files*

Defendant's third argument involves the failure of the Department of Corrections to produce his juvenile and adult records (correction file) in its custody; these materials included psychological and psychiatric reports and evaluations, presentence investigations and other records.

Prior to trial and following defendant's discovery request,

the Department of Corrections informed defense counsel that defendant's correction file had been lost. Only a 1979 presentence investigation was provided to counsel. Defendant filed a motion to suppress his admission to police. This motion alleged that the failure of the State to produce his correction file substantially prejudiced his ability to show that his *Miranda* waiver was involuntary due to his low intelligence and emotional instability. He cites *Culombe* v. *Connecticut,* 367 U.S. 568, 620–21 (1961), *Davis* v. *North Carolina,* 384 U.S. 737, 742 (1966), and other cases to the effect that "educational and mental shortcomings are relevant factors in the voluntariness analysis." The motion was denied. Subsequent to trial, the lost information was found and defendant contended the material would also have been relevant to a possible insanity defense, to the issue whether defendant was competent to stand trial and would have exposed possible defense witnesses. Defendant's motion for a new trial based upon the lost file was also denied.

The State argues that although defendant may not have had all Corrections Department records, he had the substance of those records prior to trial and, therefore, their absence was harmless.

On November 19, 1981, pursuant to discovery, the defense was provided with a 1977 psychiatric evaluation attached to a 1979 presentence investigation report (PSI). The evaluation, completed by a doctor and social worker in 1977, stated that defendant was not retarded but was learning disabled. The probation report identified his I.Q. and also stated that, in 1977, he appeared competent to stand trial and was willing and able to cooperate with his attorney. The report went on to describe defendant as a person who was "significantly depressed" and who exhibited a "seriously disturbed intrapsychic and social adaptation." Furthermore, defendant was seen as "hypersensitive, resentful, constricted, apprehensive and fearful." The report detailed a history of serious drug abuse and concluded that although defendant was not psychotic, he had a "potential for more serious emotional disturbance."

In his Motion For A New Trial defense counsel mistakenly stated that he did not have this 1977 report and placed great reliance upon it. Counsel also stated, however, that "[t]he two hundred pages of material ultimately supplied . . . after trial

contained numerous references by numerous individuals relating to the defendant's mental status and psychiatric problems. Based upon those, the defendant certainly would have raised a question of competency and sanity at the time of the alleged offense."

After a review of defendant's correction file, we make several observations. First, much of the information contained in this file is not material in any way. Second, we agree with the trial court that the information is cumulative to that contained in the 1977 psychiatric evaluation possessed by the defense. Although the information in the file was complete and extensive, we find no information about defendant's mental or emotional state that significantly differs from that contained in the PSI; it is mainly repetitive. Third, and most important, is the fact that the 1979 PSI was more than sufficient to alert the defense of the potential suppression, insanity and competency issues. The defense possessed this information in November of 1981. There is nothing in the record to indicate that defense counsel asked for a new psychiatric report, competency evaluation or intelligence testing prior to trial. We also observe that the 1977 evaluation was signed by two professionals who would have been potential witnesses.

The denial of a motion for a new trial, V.R.Cr.P. 33, will not be reversed unless the trial court has abused its discretion. *State* v. *LeBeau*, 144 Vt. 315, 319, 476 A.2d 128, 130 (1984) ; *State* v. *Dezaine*, 141 Vt. 335, 338, 449 A.2d 913, 914 (1982). To warrant a new trial on the basis of newly discovered evidence, defendant must meet five requirements: (1) it must appear that the new evidence would probably change the result upon retrial; (2) the new evidence must have been discovered subsequent to trial; (3) the evidence could not have been discovered earlier by the exercise of due diligence; (4) the evidence is material; and (5) the evidence is not merely cumulative or impeaching. *State* v. *Dezaine, supra,* 141 Vt. at 338, 449 A.2d at 914 (citing *State* v. *Jackson,* 126 Vt. 250, 252, 227 A.2d 280, 282 (1967)). The test "is a stringent one," *id.*, and all of the factors must be met.

There was no abuse of discretion by the trial court. The information contained in defendant's correction file was merely cumulative, and we do not believe defendant was

harmed by its absence. Although it was a more complete history, it was also outdated and defense counsel made no attempt to obtain current information upon which to base his trial strategy. The motion for a new trial was properly denied.

## IV. *Voir Dire Challenges*

During jury selection counsel for the State and the defense both exhausted their allotted six peremptory challenges to excuse potential jurors. Defendant argues that reversal is required in this case because he was not satisfied with the jury as drawn, that his requests to have two potential jurors excused for cause were improperly denied, forcing him to exhaust his peremptory challenges, and, therefore, his request for one additional peremptory challenge should not have been denied.

It is basic to the ideal of a fair trial that a defendant be tried only by "fair-minded, impartial jurors." *Lattrell* v. *Swain*, 127 Vt. 33, 36, 239 A.2d 195, 197 (1968). A potential juror is subject to challenge for cause if his or her examination "exposes a state of mind evincing a fixed opinion, bias, or prejudice . . . ." *Id.* In *State* v. *Holden*, 136 Vt. 158, 161, 385 A.2d 1092, 1094 (1978), we held that counsel should not be forced to use his last peremptory challenge to excuse a juror challengeable for cause when he has indicated that there is an additional juror that he wishes to challenge peremptorily. In other words, a peremptory challenge must not be expended on "a legally incompetent juror so that it is not available to dismiss an objectionable but not incompetent juror." *State* v. *Lawrence*, 137 Vt. 597, 603, 409 A.2d 997, 1001 (1979).

A review of the voir dire record discloses that defense counsel had exhausted his peremptory challenges just prior to choosing the twelfth juror. Following extensive questioning of this juror, the court asked counsel whether there were challenges for cause. There were none. Although defense counsel shortly thereafter requested an additional peremptory challenge, that request was not based upon dissatisfaction with a particular potential juror but rather upon a belief the state's attorney should have provided him with certain information about a juror excused peremptorily by the State.

Because counsel did not express any dissatisfaction with the panel as finally drawn, or indicate that there was any-

one on the panel he desired to remove by peremptory challenge, he has failed to demonstrate prejudice or reversible error. *State v. White,* 142 Vt. 73, 76, 451 A.2d 1137, 1138 (1982).

## V. *Suppression of Statements*

Defendant next argues that the denial of his Motion to Suppress Statements was erroneous because defendant's mental capacity was deficient and, therefore, he was incapable of executing a valid waiver of his right to speak with an attorney. He argues that the trial court's findings and order were inadequate in that they did not specifically address this issue and that because the correction file was not available, he was not afforded "a full and fair hearing on the issue of voluntariness."

Defendant moved, on December 24, 1981, to suppress any and all statements made by defendant to the police. He alleged only that "said statements were not obtained through a knowing, intelligent and voluntary waiver of his fundamental constitutional rights." On January 29, 1982, a full evidentiary hearing was held on various defense motions including the motion to suppress. At this hearing, defense counsel argued that defendant lacked sufficient knowledge and intelligence to execute a valid waiver. No witnesses, however, were called to testify on this issue nor were any recent tests or evaluations submitted.

The court's Findings and Order, dated March 9, 1982, more than adequately addressed this issue. Although the court noted that defendant's low educational level and limited ability had been established by evidentiary submissions, it also noted that there was no evidence to show that he was mentally incompetent or unable to understand the consequences of his waiver when it was made. The court stated that "the criteria of an intelligent waiver depends not upon the number of degrees a person has, but the quality of his understanding of what is being given up. . . . His intelligence is below normal; but it is not so low that he could not apprehend his rights." In regard to the corrections materials, the court felt it "patently obvious that the intelligence and the ability of Defendant to provide a meaningful waiver can be established in a multitude of readily available methods [other] than by Department of Corrections records."

 Accordingly, we find that defendant was afforded a "full and fair hearing" and was supplied with more than adequate findings and conclusions on his suppression claim. The weight and sufficiency of the evidence on the issue of voluntariness is for the court and must stand if supported by credible evidence. *State* v. *Breznick,* 134 Vt. 261, 265, 356 A.2d 540, 542 (1976); *State* v. *Rocheleau,* 131 Vt. 563, 574, 313 A.2d 33, 41 (1973). This is true even though there may be inconsistencies or even substantial evidence to the contrary. *State* v. *Rocheleau, supra,* 131 Vt. at 574, 313 A.2d at 41. The court's ruling in this case was focused upon the issue and supported by the evidence. It must stand.

## VI. *Cross-examination*

Defendant argues, finally, that his cross-examination of the complaining witness was improperly limited by the trial court. At the commencement of his cross-examination, the following exchange occurred:

Defense Counsel: Good morning. Do you understand that you're still under oath?

Complainant: Yes.

Defense Counsel: And you did take an oath this morning?

Complainant: Yes.

Defense Counsel: And in prior proceedings, have you also taken oaths? Do you understand what the oath is about?

Complainant: During depositions, yes.

Defense Counsel: Yes. And what essentially is the purpose of taking an oath?

The Court: [Defense Counsel], I think that's enough examination on this point. I see no need for it.

Defendant contends that his inability to question the complainant about her willingness to live up to the obligations of an oath in light of prosecutorial remarks made in closing argument was prejudicial error. During closing argument the prosecution told the jury, "You've heard the expression 'my word is my bond' and I say in this case it applies." Defendant

makes no claim that the closing remark was improper but only that it serves to heighten the prejudice sustained by the improper limits placed upon his cross-examination.

The scope of cross-examination is a matter for control by the trial court, and we will not disturb a ruling unless there has been a clear abuse of discretion. *State* v. *Settle,* 141 Vt. 58, 63, 442 A.2d 1314, 1316 (1982) ; *State* v. *Baldwin,* 140 Vt. 619, 620, 442 A.2d 1291, 1292 (1982).

We find no abuse of discretion here. The witness stated that she understood the significance of her oath to tell the truth and that she was still bound by her oath taken earlier that day. The witness had not yet been questioned by defense counsel as to any pertinent events and was, therefore, not yet subject to any impeachment. Continued questioning by defense counsel was clearly cumulative and unwarranted under these circumstances. We cannot find prejudice to the accused where there is no indication that the witness had lied, was incompetent or otherwise unable to understand her moral duty to tell the truth. Where a previous question covered substantially the ground covered by a subsequent question, there is no error in excluding the latter. *State* v. *Berard,* 132 Vt. 138, 148, 315 A.2d 501, 508, *cert. denied,* 417 U.S. 950 (1974) ; *State* v. *Lapan,* 101 Vt. 124, 131, 141 A. 686, 689 (1928) ; *State* v. *Williams,* 94 Vt. 423, 434, 111 A. 701, 706–07 (1920). The trial court did not abuse its discretion in thus limiting cross-examination of the complaining witness.

*Affirmed.*