STATE of Maine

v.

Robert P. INMAN.

Supreme Judicial Court of Maine.

Jan. 2, 1976.

Richard S. Cohen, Deputy Atty. Gen., Charles K. Leadbetter, Asst. Atty. Gen., Augusta, for plaintiff.

Marshall A. Stern, Twitchell, Gray & Linscott, by Frederick J. Badger, Jr., Bangor, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

A Penobscot County jury found the defendant guilty of felonious homicide in the penalty degree of murder. The defendant has appealed. We deny his appeal.

The victim was Miss Charlotte Dunn, an elderly lady, who lived alone in an apartment in Bangor. Sometime about midnight on May 31, 1971, residents of other apartments in the building heard sounds of a struggle, a woman's screams and "growling noises" coming from the vicinity of the victim's apartment. None of them reported or made any effort to determine the nature of the woman's distress.

The next morning the victim's semi-nude, badly beaten body was found sprawled on the floor of her apartment.

She had been strangled. It was evident that the victim had also been cruelly sexually mistreated. A latent palm print was found on the floor near her left shoulder.

The defendant had occupied an apartment in that building some seven or eight months before. His name was given to the police as a suspect soon after the discovery of the crime.

Lieutenant Bruton of the State Police assumed charge of the investigation and that evening he sent a State Police detective and another officer to the defendant's home in East Holden to ask the defendant to come with the officers to the Bangor Police Department for questioning. A third officer met them in East Holden to direct them to the defendant's home. During the trip to the Police Station the defendant made an exculpatory statement which the defendant moved unsuccessfully to suppress because of the failure of the detective to have explained to the defendant his rights under the rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).

At the Police Department, Lieutenant Bruton noted what appeared to be scratches on the defendant's hands, face and neck and "floor burns" on his elbows. The defendant was not placed under arrest until a time several weeks later when the police obtained his palm print and were satisfied that it matched the latent print which had been found beside the body.

The defendant was indicted upon a charge of murder. Before trial the defendant moved to suppress the palm prints of the defendant which the State had obtained. The Justice in the Superior Court, utilizing the provisions of M.R.Crim.P., Rule 37A(a) reported to us the issue of the validity of the procedure by which the palm prints were obtained by the police. We denied the motion to suppress. *State v. Inman*, Me., 301 A.2d 348 (1973). Trial then proceeded in the Superior Court and the defendant was found guilty. We will consider separately the several errors claimed by defendant on appeal.

*The Failure of the Justice to Give an Instruction on Manslaughter*

At the conclusion of the evidence defense counsel requested that the jury be instructed as to the elements of manslaughter, apparently referring to voluntary manslaughter.

We held in *State v. Park*, 159 Me. 328, 333, 193 A.2d 1, 4 (1962) that there was no error in refusing to instruct on manslaughter "in the absence of any evidence from which a jury could find [the elements which would have reduced the crime to] manslaughter." *See also State v. Hilliker*, Me., 327 A.2d 860 (1974). At the time of the *Park* decision, Maine Law for more than a century had placed upon the defendant the burden of demonstrating by a fair preponderance of the evidence that the crime was committed in a heat of passion on sudden, adequate provocation if an intentional felonious homicide was to be punished as manslaughter instead of murder. *State v. Hilliker, supra.*

Since then, of course, in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L. Ed.2d 508 (1975) the United States Supreme Court held that the due process clause of the fourteenth amendment requires the State to prove beyond a reasonable doubt the absence of heat of passion on sudden, adequate provocation *when the issue is properly presented* in a homicide case.

We are aware of no policy consideration that would justify our moving from the basic position we took in *Park* to the effect that a defendant is not entitled to an instruction on voluntary manslaughter in *every* murder trial, and nothing in *Mullaney v. Wilbur* mandates that we do so. In fact, the Court in *Mullaney v. Wilbur* specifically disclaimed any intention to affect existing State rules that require the defendant to show "some evidence" of the

factors reducing to voluntary manslaughter before requiring the State to negate them.

■ We must bear in mind, however, that when *Park* spoke of "evidence from which a jury could find manslaughter" the opinion was speaking of evidence which could satisfy the jury by a fair preponderance because such was the defendant's burden of proof prior to *Wilbur*. The mandate of *Wilbur* is that due process requires the State to prove beyond a reasonable doubt the *absence* of causative heat of passion on sudden adequate provocation "when the issue is properly presented." 421 U.S. at 704, 95 S.Ct. at 1892, 44 L.Ed. 2d at 522. This federal constitutional principle does not demand that the State should anticipate and negate all possible sources of provocation which could have induced a theoretical heat of passion but only that when some evidence of heat of passion arising from such sudden, adequate provocation has actually been presented, the defendant is entitled to a verdict of manslaughter unless the jury is satisfied beyond a reasonable doubt that such passion was not the cause of the defendant's homicidal conduct. *State v. Stackpole*, Me., 349 A.2d 185 (1975).

We do not feel that either precedent or policy considerations necessitate or would justify an interpretation of our own constitution that would place a heavier burden upon the State than that which *Wilbur* imposed through federal constitutional principles. The *Wilbur* rule is, in fact, much the same as that which we have found to be fair and workable in the analogous situation of self-defense. *State v. Millett*, Me., 273 A.2d 504 (1971).

But the *Park* holding must now be translated into the principles of *Wilbur* by redefining the quantum of evidence necessary to require a manslaughter instruction. To paraphrase the language we used in *Millett* to describe the defendant's burden of production of evidence which would generate the issue of self-defense, our rule may be stated to be that the defendant "assume[s] the *burden of going forward with evidence* [1] of such nature and quality as to raise the issue of [heat of passion upon sudden adequate provocation] and justify a reasonable doubt" (emphasis added) (273 A.2d at 507) that the defendant's conduct was uncontrolled by the passion.

■ Therefore, no instruction on voluntary manslaughter need be given unless the jurors have heard such evidence as would generate the issue (as we have defined it) in the minds of reasonable men and women. Whether there was evidence that would require the giving of the manslaughter instruction was a question of law for the determination of the Court. *State v. Park, supra*, 159 Me. at 333, 193 A.2d at 4.

Such evidence was completely absent here and the Justice's refusal to give the instruction was not error.

There was no request for an instruction on involuntary manslaughter, no doubt because the trial in this case took place before our holding in *State v. Northup*, Me., 318 A.2d 489 (1974) that the State must prove that the killing was intentional as distinguished from involuntary. However, here—as in *Northup*—we find no manifest error in the Justice's failure to give such an instruction because we see no reasonable possibility that the jury, if so instructed, would have found that the killing of the victim was unintended.

■ The defendant further contends that manslaughter is a traditional area of compromise for juries in murder cases and

---

1. Of course, in speaking in terms of the defendant's duty of production we do not intend to suggest that the defendant must produce such evidence from the lips of witnesses whom he calls to the stand but, instead, that such evidence must have been presented by one side or the other or by both.

See also the Court's discussion of a defendant's burden of production in *Wilbur* at footnote 31.

that the defendant was entitled to have it available to the jury as an acceptable third alternative to those of a conviction for murder or an immediate return of the defendant into society as not guilty.

We categorically reject this theory and adhere to the concept that it must be presumed that the jurors will remain faithful to their sworn obligations and that they will return a verdict of manslaughter only if they find facts justifying it upon judicially recognized principles of law. *State v. Carey,* Del.Supr., 6 W.W.Harr. 521, 178 A. 877 (1935).

*The Taking of Judicial Notice of the Reliability of Palm Prints and the Justice's Instruction Thereon*

 Midway in his instructions the Justice told the jury:

"Now it may be that the Court will take judicial notice of certain facts. I believe before I am finished I will.
 . . . ."

At the conclusion of his instructions he said:

"I indicated that I would ask you to take judicial notice of one thing. I now say that I have taken judicial notice that fingerprinting, which includes palmprinting, is the most accurate present means of identification, and that it is universally used in cases of this kind, but I also say to you that fingerprint and palmprint analysis requires greater skill than that which the ordinary witness has.

And in this connection, you are to assume that I have taken judicial notice and hand it to you that the fingerprint method of identification is accurate and no two sets of fingerprints or palmprints are exactly alike."

The defendant objected to the giving of this instruction. He now urges us that the reliability of the palm print method of identification is not subject to judicial notice and is a question of fact for jury determination upon adequate evidentiary proof.

We said in *State v. Rush,* Me., 324 A.2d 748, 750 (1974):

"To be a proper subject of judicial notice, a fact must be a matter of common knowledge, which is generally accepted without qualification or contention. . . . The modern trend has enlarged the concept to include matters which are of such verifiable certainty that they may be confirmed by reference to sources of indisputable accuracy." (Citations omitted.)

In *State v. Inman, supra,* 301 A.2d at 353, we recognized the absolute reliability of fingerprint identification, saying:

"When one's fingerprints are found in a particular place such person cannot be heard to say he was not at that place at some time."

The infallibility of fingerprints as a method of identification is now too widely accepted to require citation of authority. We further acknowledged in *Inman* that there is little or no difference between the methods used in the comparison of fingerprints and in the comparison of palm prints. The reliability of palm prints as evidence that a person was in the place where the palm print was found is now so well accepted that we know of no courts who hold such evidence to be incompetent. In fact, since the learned and comprehensive analysis of their attributes by the Nevada Court in *State v. Kuhl,* 42 Nev. 185, 175 P. 190, 3 A.L.R. 1694 (1918), palm prints have been adjudged no less reliable than fingerprints in jurisdictions where the issue has arisen. *E. g., People v. Buckowski,* 37 Cal.2d 629, 233 P.2d 912, *cert. denied,* 342 U.S. 928, 72 S.Ct. 369, 96 L.Ed. 692 (1951); *Williams v. State,* Miss., 210 So.2d 780; *People v. Les,* 267 Mich. 648, 255 N.W.2d 407 (1934); *People v. Jennings,* 252 Ill. 534, 96 N.E. 1077, 43 L.R.A., N.S., 1206 (1911); *People v. Lindsay,* 227 Cal.App.2d 482, 38 Cal.Rptr. 755 (1964);

*State of North Carolina v. Rogers,* 233 N. C. 390, 64 S.E.2d 572, 28 A.L.R.2d 1104, 1127–1131 (1951); *People v. Atwood,* 223 Cal.App.2d 316, 35 Cal.Rptr. 831 (1964).

The Vermont Court, in *State v. Lapan,* 101 Vt. 124, 141 A. 686 (1928) upheld an instruction in which the presiding Justice took judicial notice of the reliability of palm print identification when properly conducted. The Court reviewed the authorities and concluded:

> "This knowledge of the courts goes so far as to enable them to say, without proof, that the imprint of the palm side of the human hand, when fairly taken, presents reliable, individual, and unchanging characteristics of the papillary ridges; and that, when those are correctly read and interpreted by one skilled in the science, they afford valuable evidence on questions of identity." 101 Vt. at 133, 141 A. at 691.

We believe that scientific observation and experience since 1928 has supported and strengthened, rather than weakened, the Vermont Court's position as to the validity of the scientific principle. In *Inman* we also said:

> "Experts in dactylography recognize that palm prints have the characteristic of uniqueness and that they contain reference points that enable accurate and conclusive comparisons *just as do fingerprints.*" (Emphasis added.) *State v. Inman, supra,* 301 A.2d at 353.

We are satisfied that this was a statement of a principle which is accepted without qualification or contention in fields of crime detection and medical jurisprudence and may be confirmed by reference to sources of indisputable accuracy. Moenssens, Moses and Inbau, Scientific Evidence in Criminal Cases, ch. 7, § 7.10. There was no error in the Justice's statement of this principle to the jury.

While the Justice took judicial notice of the scientific principle of the *capacity* for identification by comparison of two sets of palm prints, he properly left to the jury to decide what confidence they should place in the securing and preservation of the print on the floor and the defendant's prints which were used for comparison and the process of comparison *as conducted by these officers,* the competence and reliability of the expert witness and the credibility of the witnesses. He did not take from the jury the essential decision of whether the print on the floor near the victim's shoulder was or was not made by the defendant's palm. In language of undoubted clarity, the Justice discussed the manner in which opinions of experts may be considered by the jury and concluded:

> "If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not founded, or that the opinion is outweighed by other evidence in the case, you may disregard the opinion in whole or in part."

We are further unconvinced that the Justice's instruction concerning palm prints was unduly emphasized by its position at the very end of the charge. The record leaves us with the impression that the Justice had nearly overlooked giving the instruction and that it was not deliberately so placed. In any event, if any emphasis resulted, it must have been dispelled by the Justice's returning to give the jury a somewhat extended further instruction on other matters after a brief bench conference with counsel.

We are not satisfied that there was error.

*The Presiding Justice's Limitation Upon the Defense Cross-Examination of Police Officers Concerning the Extent and Results of Their Investigation Into the Possibility That Certain Other Persons May Have Committed the Offense*

It is the defendant's contention that the presiding Justice repeatedly and arbitrarily

curtailed counsel's cross-examination in areas into which counsel were entitled to inquire. He urges further that these denials were announced in a manner that demonstrated a pattern of bias and hostility on the part of the Justice, and alone, is sufficient to entitle the defendant to a reversal of the judgment against him.

We have examined with particular care the areas of cross-examination of which the defendant complains. The defense counsel had persistently questioned the officers as to their investigation of several other individuals who, the defense suggested, might well have been considered suspects in this crime and had sought to show that insufficient efforts had been made to determine their possible involvement. Defense questioning also seemed directed toward suggesting that the police investigation was poorly conducted. The presiding Justice permitted the defense considerable leeway in these respects but frequently terminated a particular line of questioning before counsel considered the issue had been developed sufficiently.

We think it is fair to say that under the pressure of a long and strenuously fought —and otherwise well conducted—trial, defense counsel may have been too persistent on occasion in attempting to pursue these subjects beyond the point of relevance and materiality and that the presiding Justice, under similar pressure, may on occasion have displayed impatience which, ideally, should have been suppressed.

■ The defendant calls our attention to two particular instances in which his questions of Lieutenant Bruton and Lieutenant Ames were excluded by the Justice in a manner which the defense considers to have been disparaging to counsel and to have denied the defense proper cross-examination. They seem to us particularly illustrative of the situation. Lieutenant Bruton was asked:

"Of all the homicide investigations that you worked last year, are all the cases finally solved and concluded?"

Upon objection by the State, the Justice said:

"No, no, no, we are trying one case here, not 100. That's entirely improper. The objection is sustained."

We can only conclude that the question was intended to suggest either the officer's incompetence or an intolerable workload and was properly excluded, although the Justice could better have phrased his exclusion less colorfully.

Later, on cross-examination, Detective Ames's answer to a question developed the following colloquy:

"A The investigation with regards to Mr. Inman, Mr. Inman was, I will have to say always the foremost person in this investigation, but he was not the only person who was investigated.

Q In fact, he was the foremost before you had uncovered any interviews of any sort, right?

THE COURT: It is time now to stop this line of inquiry. We have developed it. The jury are not going to be called upon to decide whether the investigation of this case by whoever did it, the Homicide Squad, the attorneys involved, whether it was adequate. The jury's sole function is to determine on whatever evidence they have uncovered—

[DEFENSE COUNSEL]: That's correct.

THE COURT:—if the case is weak, it will develop to the jury that way as the State comes out with the evidence."

■ The presiding Justice has a responsibility to limit the examination of witness-

es to relevant matters and the exercise of this responsibility is particularly difficult in cross-examination. In our opinion, the Justice here permitted the defense proper opportunity to attack the probative value of the evidence developed by the police bearing on the defendant's guilt or innocence. Obviously, evidence indicating that someone else may have committed the crime would be relevant and material. The Justice permitted considerable exploration into this area. He was required to exercise a careful discretion as to when the question as to the extent and adequacy of the police investigation into the conduct and whereabouts of other persons at the time of the crime passed beyond the point of proper cross-examination. We are satisfied that he did not abuse this discretion.

 Counsel are entitled to be treated courteously and respectfully by a presiding Justice. We must also bear in mind that a persistent return to an area of inquiry which has been repeatedly excluded by the Justice may indicate the necessity for more firmness in his manner of ruling.

While we fully agree with counsels' insistence that they are entitled to conduct their cross-examinations free from harassment and disparagement by the Court, we do not believe that the Justice's occasional reference to his prior rulings on the same issue can be so construed.

*The Sufficiency of the Evidence to Support the Defendant's Verdict of Guilty*

 At the close of the State's case the defendant moved for an acquittal. The motion was denied. As the defendant then proceeded to present witnesses in defense after the Justice's denial of this motion, appellate review of the denial of this motion was waived. *State v. Heald,* Me., 333 A.2d 696 (1975); Glassman, Maine Practice, §§ 29.2, 29.6. The defendant did not take the stand at trial.

 The defendant renewed his motion at the completion of all evidence, thus presenting for appellate review the question of whether the evidence in its totality warranted the jury's believing beyond a reasonable doubt that the defendant was guilty as charged. *State v. York,* Me., 324 A.2d 758, 769 (1974).

 The jury could have found:

The elderly victim, who had some cardiac insufficiency and a hip impairment, had for several years been the collector of rent money in the apartment where she lived. The defendant had occupied an apartment in that building for several months ending some eight months before and had on some occasions paid his rent to her.

She was killed at about midnight of May 31, 1971, by violent strangulation after receiving a severe beating which fractured three ribs, broke her jaw, and left multiple bruises and abrasions on her face and body. The autopsy revealed fluid blood in the vagina and a hemorrhagic and bruised area on the inside of the vagina. Her body was found lying on its back with her nightgown pulled up around the shoulders and her arms outstretched. A broken candle was found on a chair in the room and there was a small piece of human tissue on one of the pieces. Several small pieces of the candle were found between the victim's legs.

These last gruesome details need to be considered because of their significance in relation to a latent right palm print which was found on the polished floor between the victim's head and her left shoulder. Testimony showed the victim to have been a person who kept her apartment neat and immaculate, cleaning her rooms frequently in spite of her afflictions. No other latent prints were found on the hard surfaces of the apartment—even those of the victim— except a few on the door casing, and the only one of these which was identified was that of an investigating officer. The position of the palm print in relation to the body was such as to permit the jury to

conclude beyond a reasonable doubt that the print was made by a person who was then astride or beside the victim and that that person was the murderer. A qualified technician from the Federal Bureau of Investigation compared this latent print with prints known to have been made by the defendant and testified that they were made by one and the same person.

Some nineteen hours after the murder, a police officer interviewed the defendant and observed what appeared to be fresh scratches on the back of his hands and in one place a piece of skin appeared to have been removed. (There had been dried blood found under the victim's fingernails.) There were also fresh abrasions on the underside of both of defendant's arms, at the elbows, which were described as "mat burns" or "floor burns". The defendant had been unable to account for their presence or for the missing piece of skin from his hand. A friend who had spent two and a half hours with the defendant (who had been wearing a short sleeved shirt) in a Bangor bar earlier on the evening of the murder, playing bumper pool and otherwise socializing, had not observed such marks on the defendant's hands or elbows then.

The defendant had denied having been in Bangor that evening. Later testimony proved this to be false, but that he had returned to his home in East Holden about an hour and fifteen minutes before the murder. He was, however, still only some fifteen minutes travel time from the scene of the crime.

About two weeks after the murder, the defendant, in answer to a question, told his friend he had killed Miss Dunn. When the friend showed surprise the defendant denied the murder. The friend said he had thought it was a joke.

The evidence was sufficient to support the jury's verdict.

*The State's Attorney's Frequent Reference in Argument to "Uncontroverted" Testimony*

During his argument to the jury the attorney for the State frequently completed his comments on the various aspects of the State's testimony by remarking that this evidence was "uncontroverted". The defendant's claim of error is not that the State's attorney incorrectly characterized the State's evidence but, instead, that it constituted an indirect prosecutorial comment upon the failure of the defendant to take the stand and give testimony.

Defense counsel made no objection during the State's attorney's argument and waited until the completion of the Justice's charge to the jury to ask that the jury be instructed that it must not be inferred from the State's attorney's use of these words that the defendant had the burden of refuting such testimony. The Justice declined to give the jury this further instruction.[2] There was no request for a mistrial, the defense apparently choosing to go to this jury, as already instructed, on the strengths and weaknesses of the trial just completed.

The question thus becomes one of whether the requested instruction was necessary to insure against a misconception of responsibilities of proof.

The right of a Maine defendant to elect not to give testimony is assured by the Fifth Amendment to the United States Constitution and by Article I, § 6 of the Maine Constitution as implemented by 15 M.R.S.A. § 1315. Prosecutorial comment must not suggest to the jury that guilt should be inferred from this election.

Recently, in *State v. Tibbetts,* Me., 299 A.2d 883, 887 (1973), we examined the federal standards protecting this right which became obligatory upon us through

---

**2.** The Justice had already explained to the jurors that they are "not obliged to accept testimony even though the testimony is un- contradicted and the witness is not im- peached."

the holding of *Malloy v. Hogan,* 378 U.S. 1, 10, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653, 661 (1964) and delineated what we would consider to be "impermissible comment" by the prosecution. We concluded that:

"Impermissible prosecutorial comment can never be deemed harmless error as a matter of law under either of two circumstances:

1. A direct, non-ambiguous and unequivocal prosecutorial comment on the failure of a criminal defendant to become a witness.

2. An indirect prosecutorial comment which, without equivocation or ambiguity, suggests that a jury must accept as true the State's evidence because it is undenied by a criminal defendant as a witness.

If a prosecutorial comment is made that falls into neither of the preceding classifications the State must demonstrate beyond a reasonable doubt, if the comment is to be deemed harmless, that the record contains no evidence, either direct or circumstantial, which would rationally support acquittal. Otherwise stated, it is only when it can be demonstrated beyond a reasonable doubt that the evidence in defense would not support acquittal by a rational and objective jury that ambiguous prosecutorial comment can be considered harmless error." 299 A.2d at 889.

In *Tibbetts* the County Attorney had said in argument:

"And who, after all, Ladies and Gentlemen, knows what takes place at the scene of a crime? Probably those that have committed the crime, if you find that these two defendants did so do,

know more about it than anyone else. Even the investigators. But that's a fact which you must find." 299 A.2d at 886.

We construed these words to have been "an ambiguous comment suggesting that the absence of the appellant as a witness aided the State in establishing the identity of the person criminally responsible for the crime charged." 299 A.2d at 890–891.

In *Tibbetts,* we perceived a rational basis for a verdict of acquittal on the failure of the State to prove identity and we could not say that the Justice's refusal to grant a mistrial was harmless.

We distinguish our present situation from that in *Tibbetts.*

In the present case the State's attorney had reviewed the evidence presented by the State, witness by witness, and he had adopted a manner of speech in which, on no less than 26 occasions, he added that the testimony was "uncontroverted". Similar to the manner in which some people, by habit, insert "you know" into their conversations, the State's attorney applied this particular rhetorical device to all types of testimony ranging from the most innocuous references to evidence of little or no significance[3] to one which gives us serious concern.

In almost all the instances of the State's attorney's repetitious use of this expression, the testimony to which he referred was such as would have been "controverted"—had it been "controverted" at all—by persons other than the defendant himself. For example, the "uncontroverted" testimony of the physical layout of the victim's apartment, the medical evidence of the cause of death, the location of the palm

---

3. For example: The evidence had shown that the victim's niece became alarmed because of her aunt's failure to keep an appointment or to answer the phone and went to her apartment with a Mr. Armes. They found the door locked and when they were unable to unlock it, Mr. Armes forced the door open with

his shoulder. The State's attorney's comment on this was:
"Then Mr. Armes, *and this is uncontroverted,* broke the door in and thereupon breaking the door in, of course, saw what's depicted in State's Exhibit Number 8." (Emphasis added.)

print, etc. A more difficult problem, however, arises in reference to Lieutenant Bruton's conversation with the defendant. The State's attorney reminded the jury that Lieutenant Bruton had testified that the defendant told him (1) that he had been at home the entire night of the murder and (2) that he had never been inside the victim's apartment.

The first may be considered insignificant as the defendant virtually conceded the falsity of his statement by presenting witnesses who testified that he was at a bar in Bangor that evening and that he said he had lied to Lieutenant Bruton in order to protect his probation status.

The State's attorney said to the jury:

"Lieutenant Bruton further quoted Robert Inman as saying that he had rented the apartment from Miss Dunn, had transacted the renting of the apartment from a doorway and had never entered the apartment. And as I remember, this is extremely important, Lieutenant Bruton's testimony is that the Defendant definitely stated that he had never been in the Dunn apartment and he had not even been in the same building since October of 1969,"

and, after arguing the credibility of the officer, he described this testimony also as "uncontroverted".

This comment by the State's attorney was neither a direct reference to the defendant's failure to take the stand nor an indirect but unambiguous suggestion that the jury must accept the officer's testimony regarding this aspect of his conversation with the defendant as true because the defendant did not deny it as a witness.

While we know from the transcript of the hearing on the motion to suppress that the officer and the defendant were alone in the room when the defendant made the statement, the jury had not been told whether there were other law enforcement people present who could have refuted the officer if his testimony had been erroneous. Other methods of controverting Lieutenant Bruton's testimony could conceivably exist, such as from his own notes, or from inconsistent reports he may have filed or conflicting comments he may have made verbally to others. In short, we consider the prosecutor's statement to have been, at worst, an ambiguous comment.

After analyzing the evidence supporting conviction (which we have previously discussed) and that which would support acquittal, we conclude that the evidence in defense could not lead a rational and objective jury to a decision that the State had failed in its burden of proof. *State v. Tibbetts, supra,* 299 A.2d at 889.

The defendant's friend, Mr. Gilbert, testified that he drove the defendant from the bar in Bangor to East Holden the night of the murder and last saw him walking toward the defendant's residence at about 10:45. The defendant's wife said the defendant arrived home at 10:45, that they talked "for a while" and that he went to sleep before she did, that "Oh, it seemed like an hour" before she went to sleep, but that she had no idea what time she went to sleep. She said when she awoke in the morning the defendant was in bed with her where he had been when she went to sleep. (The screams which had apparently resulted from the beating of the victim had been heard about midnight. One could under average conditions drive from the defendant's residence to the victim's apartment, without exceeding the speed limit, in approximately fifteen minutes. The defendant owned two automobiles.) Although the defendant went to work with her the morning after the murder, she said he had telephoned her at noon to come to drive him home as he was ill with diarrhea. Although she explained that he had a festering condition on the side of his face due to an allergy, she had seen no scratches on his hands except a scab on his hand which he showed her after he returned from the police station, and she had seen no "floor burns" on either of his elbows. While Mr.

Gilbert minimized the extent of the scratches he saw on the defendant's hand the day *after* the murder he agreed that one was "probably an inch long" and he said that although he and the defendant (who wore a short sleeved shirt) had played bumper pool together for "quite a period" the evening of the midnight murder, he had not noticed this scratch on the defendant's hand then, or any floor burn type of marks on his elbows. The mother and father of the defendant also described a festering condition on the defendant's face which was evident on the day the murder was committed and before its commission.

Mrs. Inman, the defendant's wife, also testified that during their occupancy of the Bangor apartment, she usually paid the rent to Miss Dunn but that on some occasions the defendant went to Miss Dunn's apartment to pay. Of course, she could not say whether the defendant had entered Miss Dunn's apartment on these occasions.

The complete absence of evidence tending to show that he *could not* have committed the crime, the meager amount of evidence which, if believed, would tend to show that it was *unlikely* that he did so when viewed against the evidence pointing toward guilt—and especially the significant position of his palm print beside the body of the savaged victim and the floor burns on his elbows—satisfy us beyond a reasonable doubt that the prosecutor's ill-advised comment was, in fact, harmless.

*The Presiding Justice's Denial at Trial of Defendant's Motion to Suppress the Palm Print*

Before the defendant was arrested or indicted for this offense, the police obtained on two occasions—one at the time of an arrest for an unrelated offense and the other as a result of the issuance of a search warrant—prints of the defendant's palms. The defendant moved for suppression of these prints (M.R.Crim.P., Rule 41(e)) and by agreement of the parties the

issue was ordered submitted to us on report by a Justice in the Superior Court (M.R.Crim.P., Rule 37A(a)) on the basis of stipulated facts and the affidavit and search warrant. We concluded that the prints were lawfully taken and ordered that the motion to suppress be denied. *State v. Inman, supra.*

When the palm prints were offered in the course of trial, defense counsel objected and orally moved that they be suppressed (1) because of insufficient proof of the continuity of possession of the exhibits themselves, and (2) because of the defendant's contention that they were illegally obtained—the same claimed invalidity which the defendant's counsel had previously and unsuccessfully urged upon the Law Court in *Inman*.

The Justice found that a foundation for introduction of the exhibits had been presented. The defense then stated in argument in chambers the bare claim that the police obtained the defendant's palm prints through entrapment (which the defendant had not claimed in *Inman*) and moved their suppression as illegally obtained, but the Justice ruled that because the validity of the manner in which the State obtained the palm prints had been determined already by the Law Court on agreed facts, the issue no longer remained to be litigated.

We first considered the office of the pre-trial motion to suppress in *State v. MacKenzie*, 161 Me. 123, 140, 210 A.2d 24, 30 (1965) and concluded that the competency of evidence offered at trial was governed by a prior finding of competence made upon a pre-trial motion to suppress. We suggested then that a contrary result might have obtained if newly discovered evidence indicating incompetence had been offered at trial. The later adoption of M. R.Crim.P., Rule 41(e) demands no revision in this policy. We hold now that a denial of a motion to suppress settles the issue, subject to the discretion of the presiding

Justice to entertain a new motion at trial upon an offer of evidence of substantial probative value which was unknown to the defense at the time of hearing on the motion and could not have been discovered by the exercise of reasonable diligence. *See,* Glassman, Maine Practice, § 41.15. In the present case, the presiding Justice considered that the submission of the issue for decision on a motion to suppress *upon agreed facts* forever barred further litigation of the issue by the defendant. As to this we do not agree. We construe the agreement at the time of pre-trial presentation to have been that such were all the pertinent facts which were known or could with reasonable diligence have been known at that time and was not intended to have and should not have the effect of foreclosing the presentation by the defendant of later discovered relevant and material facts at time of trial, in the Justice's discretion.

The presiding Justice did, however, adopt the correct procedure a moment later when he offered to reconsider the matter if the defense would offer any "newly discovered evidence that has a substantial bearing on the legality or illegality of the procurement of the prints." The Justice said, "I will listen to that, but until I hear it, I deny the motion to suppress."

No such evidence was offered by the defense and the prints were admitted.

There was no error.

*The Presiding Justice's Denial of Defendant's Motion to Suppress the Statement the Defendant Made to the State Police Detective*

The evidence presented on the motion to suppress was that in the early evening of the day the victim's body was discovered, Lieutenant Bruton sent a trooper detective to the defendant's home in East Holden to request that the defendant come with him to Bangor to talk with Lieutenant Bruton. The detective knocked and was admitted to the defendant's home. He told the defendant the police were investigating Miss Dunn's death and requested the defendant to come in to Bangor "to talk with Lieutenant Bruton". The defendant said he did not want to go until he had talked with his attorney. He then made a telephone call to his attorney and after some conversation between the defendant and his attorney, the attorney asked to speak to the detective. The detective took the phone and told the attorney that the police wished to question the defendant concerning the murder of Miss Dunn. The defendant then returned to the phone, conversed further with his attorney and (as the defendant testified at hearing on the motion to suppress) the attorney advised him "to go down there for questioning" but "if they wanted to do anything more than talk to me, to call him up."

The defendant then said he would go and he went voluntarily to the police station with the detective (and either one or two other officers who had accompanied the detective and who had waited outside the building). In the detective's car, the defendant asked the detective why the police wanted to talk with him concerning this matter and the detective responded that they wanted "to check into what he had been doing" the night before and the detective then asked the defendant "what he had been doing the night before". The defendant answered that he "had been home all night". At this point no *Miranda* warning had been given the defendant.

A few minutes later, in Bangor, Lieutenant Bruton did give the defendant the full *Miranda* warning and in the course of some questioning by the officer, the defendant repeated his statement, adding that he had not left his house from 4 p. m. the afternoon of Miss Dunn's death until he went to work the following morning.

Shortly after this the defendant asked to use the police phone in order to speak further with his attorney. Following the discussion with his attorney, the defendant demanded that he be either arrested or taken home, as his attorney had advised. The

police took him home and he was not arrested for this offense until seven weeks later.

The presiding Justice held a hearing in the jury's absence on the voluntariness of these statements to Lieutenant Bruton and the detective at which the defendant testified. The Justice then ruled that it was not necessary for him to decide whether the defendant was entitled to an explanation of his *Miranda* rights because he found Lieutenant Bruton had given them and he found that the defendant's statement to Lieutenant Bruton was voluntary. Lieutenant Bruton's testimony was admitted. The Justice made no ruling then as to the statement to the detective.

The defendant does not now question the Justice's ruling as to Lieutenant Bruton's testimony. He did, however, object to the detective's testimony when it was offered at trial[4] as an involuntary inculpatory[5] statement given in violation of his right to have a *Miranda* warning. The Justice found beyond a reasonable doubt that the defendant's answer to the detective's question was given voluntarily. Although he did not rule specifically on the *Miranda* issue we are satisfied from his language that he felt the warning was not required because the defendant had not been in custody.

We have no difficulty in concluding that we cannot say that the presiding Justice was clearly erroneous in finding that the statement to the detective was made voluntarily. But at the time the detective asked the defendant what he had been doing the night before, the defendant had not been given the explanation of his rights as mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. The detective's testimony before the jury was substantially the same. Then, the detective testified:
"Well, Mr. Inman kept asking me why Lieutenant Bruton wanted to talk with him, and I told him that it was that he had been a resident of the apartment and that they wanted to find out what he had been doing

The familiar holding announced in *Miranda* forbids the prosecution to offer as evidence any statement made by the defendant during periods of custodial interrogation "unless the use of procedural safeguards effective to secure the privilege against self-incrimination have been demonstrated." 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

■ "Custodial interrogation" according to *Miranda* means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way". *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Of course, custody can occur without the formality of an arrest and in areas other than in a police station. *People v. Arnold,* 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967).

■ The question immediately becomes one of whether the detective's inquiry was made during a custodial interrogation. The *Miranda* procedures

"are not meant to preclude, law enforcement personnel from performing 'their traditional investigatory functions' such as general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process . . . [and] [u]nless restraint of an individual by law enforcement officers is 'significant', *Miranda* warnings are not required." *United States v. Montos,* 421 F.2d 215, 222–223 (5th Cir. 1970); *United States v. Akin,* 435 F.2d 1011 (5th Cir. 1970).

■ It is clear that the facts of each particular case must be closely examined to determine whether the line between "gen-

the night before, and I asked him what he was doing the night before, and he said, 'Well, I was home all night.'"
5. Other testimony given by defendant's witnesses disclosed that the defendant had been with a friend at a bar in Bangor in the evening, returning home at about 10:45 p. m.

eral investigation" and "custodial interrogation" has been crossed. *Agius v. United States,* 413 F.2d 915, 918 (5th Cir. 1969); *United States v. Montos, supra.*

The salient feature of the four cases decided in *Miranda* was the incommunicado interrogation in police dominated atmospheres. We find that in some cases Courts have found it particularly significant that police attention had already focused upon the defendant as a suspect. *Windsor v. United States,* 389 F.2d 530 (5th Cir. 1968); *State v. Anderson,* 102 Ariz., 295, 428 P.2d 672 (1967); *United States v. Bey,* 385 F.Supp. 227 (W.D.Pa. 1974); *Agius v. United States, supra.* In others and on other facts the determinative factor seems to have been whether restraint was imposed upon the defendant at the time of questioning. *United States v. Akin, supra.* The tone and technique of the questioning has been found of assistance in deciding the issue. *People v. Arnold, supra.* The location in which the questioning takes place may be important but is not controlling. *Windsor v. United States, supra.* The presence or absence of probable cause, and the subjective intent of the police have been considered significant. *United States v. Montos, supra.*

■ Turning again to the facts of our own case, we find that at the time the detective asked the question of the defendant there was no recognizable evidence pointing particularly to the defendant as the perpetrator of the crime. His name had, however, come up during the early hours of the investigation. He was remembered as being a tenant of the building some months before and one who thus may have known the victim. Furthermore, the police doubtless knew that (as we learned from the record in *State v. Inman, supra*) the defendant was at that time under indictment in the same county charged with a

brutal sexual attack upon another elderly lady.

Although these latter facts were not, for obvious reasons, disclosed to the jury it would be routine police investigatory procedure, when no evidence pointing to a particular person is present, to seek to learn the whereabouts of men who have demonstrated proclivities toward committing such attacks. The substance of the police testimony seems to be that they considered him a suspect but not the only suspect. At the time of his interrogation the investigation had not focussed on the defendant, and other suspects were interrogated during the weeks following. For our purposes in classifying the single question put to him by the detective, we would consider the defendant to have been one of a general group of potential suspects.

The defendant urges us that although the defendant was not under arrest at the time he answered the detective's question, his statement was made in an intimidating and unsettling atmosphere which gave the detective's question the effect of a custodial interrogation. The defendant's situation was an unusual one. His decision to accompany the officers was voluntary and came after a telephone conference with his competent and experienced attorney who had advised him as to his conduct with the officers—that he should answer their questions and demand to be taken home if he was asked to undergo any tests. He was completely free from any physical restraint. We believe that no reasonable person in the defendant's situation could have considered himself in custody at that time and no evidence of actual intimidation during the fifteen minute trip to Bangor appears on the record.[6] The subject of the purpose of the coming interrogation by Lieutenant Bruton was initiated by the defendant himself. There was neither sub-

6. At the hearing on the motion to suppress the defendant answered "Yes" to his attorney's question ". . . . [d]id you feel you were in custody?" He went on to explain "Well, I was just worried about breaking the probation."

tlety nor threat in the question by the detective. There was no appearance of the police-dominated atmosphere in the defendant's home or in the car and defendant demonstrated a continuing control of the situation later, in the police station, when he used the department phone to confer with his attorney and then abruptly terminated the interrogation by demanding, and receiving, a ride home. The presiding Justice was apparently satisfied that the detective's question was not a custodial interrogation necessitating a *Miranda* warning. We agree.[7]

■ Furthermore, if the admission of the statement can be considered to be error, we are satisfied beyond a reasonable doubt that it was harmless. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967). The defendant's statement that he had remained at home all evening is significant only as an exculpatory statement which the State used to demonstrate an untruth—i.e., that he had not been home all evening but had in fact been at a bar in Bangor in the early evening. (The defense contended at trial, not unreasonably, that he lied because the conditions of his probation forbade his drinking intoxicating liquor in bars.) Its lack of effective probative force comes from the fact that the same witnesses who placed the defendant in Bangor earlier in the evening also testified that he returned to his home in East Holden at about 10:45—an hour or more before the murder of Miss Dunn.

*The Presiding Justice's Appointment of a Foreman*

■ On appeal, for the first time, the defendant attacks the authority of the presiding Justice to have appointed a foreman of the jury. Since the defendant did not act to save this issue for appellate review we examine the record only to see if the defendant has demonstrated "manifest error causing serious injustice". *State v. Melanson*, Me., 325 A.2d 14 (1974); M.R. Crim.P., Rule 30(b).

■ It is the defendant's contention that 14 M.R.S.A. §§ 1204 and 1207 require the election of a foreman by the members of the panel. We cannot agree. Section 1204, as reenacted in the 1964 revision, continued to provide for the selection at the beginning of a term of a first and second jury,[8] one or the other of which sat in trial of all civil jury cases unless a "drawn" jury was requested. Section 1206 provided for the oath of each juror and section 1207 for the members of each of the "regular" juries to elect one member of each to serve as foreman for each trial before them unless that person is absent or excused from service.

At the time of the 1964 revision, section 1204 also specifically permitted "drawn" juries in any "civil or criminal case" when requested,[9] in which situation the presiding Justice was authorized to appoint the foreman for each trial.

■ Now, after several amendments, the concept of "regular" juries has disappeared, the reference to criminal trials was eliminated by P.L. 1965, ch. 356, § 12 and section 1204 now provides for drawn juries in all civil cases with the foreman to be appointed by the presiding Justice. Thus, there is now no statutory designation of the manner in which a foreman is chosen for a criminal jury trial. We note that P. L. 1965, ch. 356, § 12 became effective December 1, 1965—the same date as the effective date of our present Rules of Criminal Procedure. We view its removal of

---

7. For the benefit of law enforcement officers we must add that, if it were not for these unusual circumstances, the defective's question might well have required a reversal of the conviction.

8. By custom, these were sometimes referred to as the "regular" juries.

9. Although this language may have encompassed the use of a "regular" jury in a criminal case, the practice, in recent years, at least, has been to draw a new jury, with a court-appointed foreman in all criminal trials.

the reference to criminal trials in section 1204 as intended to separate statutory reference to criminal from civil procedure and to better accommodate criminal procedure to the soon-to-be-effective criminal Rules—not as intended to abolish the traditional method of appointment of criminal jury foremen by the Court.

As the new Rules failed to make provision for the appointment of the foreman, we consider that in a criminal trial the presiding Justice, whose responsibility it is to assure the orderly conduct of the trial, has the discretion either to appoint a foreman or to direct the jurors to elect the foreman. In a trial such as this, where the electors would include alternate jurors who may or may not participate in the ultimate decision, it is particularly appropriate for the Justice to make the appointment.

There was no error.

 The defendant also now complains that on March 2, immediately after the foreman's appointment, the foreman told the Justice that he had planned to leave March 10 on a trip and had made a deposit of $700.00 to insure his reservations. The Justice agreed to discuss the question with the juror later, and the trial commenced. The record shows no later reference to this situation. The case went to the jury at 4:25 on the afternoon of March 9. The jurors announced their readiness to report their verdict forty mununtes later.

The defendant now argues that the choice of the foreman was improvident as this person's desire to be free on March 10 would have been likely to have conflicted with his sworn duty to give thorough consideration to the evidence that would be presented and that turned out to be the case.

The defense made no objection to the seating of the juror or to his appointment as foreman. As the trial approached its conclusion on March 9 the juror evidently remained acceptable to the defendant. Even at 4:25 P.M. of the day before the

juror's trip was to start, the defendant failed to object to the foreman's retiring to deliberate with the other eleven although three alternates were available and he could still have been replaced. We can only conclude that the defense, although aware of the foreman's commitment for the following day, chose that the foreman should participate in the jury's deliberations. Now, after receiving an unfavorable verdict, his objections to the foreman's status comes too late. The record shows nothing which indicates that the period the jury spent in deliberation was shortened because of the juror's prior commitment and it was only 5:05 p. m. of the day before the day of his planned departure when the jurors arrived at their verdict. We have not been satisfied that manifest error occurred.

### The Brevity of the Jury's Deliberation

 The jury retired to deliberate on its verdict at 4:25 p. m. and forty minutes later the foreman knocked on the jury room door and announced that the jury had reached a verdict. It is the defendant's position that this period of forty minutes was not long enough to permit adequate consideration of the evidence presented in four days of trial testimony and proper deliberation upon the issues.

. The defense also comments upon the fact that, after reporting their verdict, the jurors delivered to the Court a "proclamation" in which they expressed admiration for the Justice's conduct of the trial and appreciation for his consideration and that of the jury officers for the jurors' comfort and welfare. There is nothing to indicate that this commendation was drafted and . signed during the forty minute period and the defense did not ask the Court to ascertain whether such was the case. As a matter of fact, the record shows that the jurors remained in the jury room an additional fifteen minutes after announcing their readiness to report before the Court was ready to receive their verdict.

The defendant argues that "either the verdict was arrived at blindly after the jury retired or it was arrived at before the jury retired and before the jury could have considered all the evidence and the Court's instructions . . . .". We are unconvinced that the record requires either of such conclusions. Instead, we agree with the analysis of the State that "[t]he issues of fact in this case were clearly drawn and the facts neither involved nor complicated. The evidence of guilt, though circumstantial, was compelling . . . It was not unreasonable for the jury to have returned a verdict in this period of time."

The entry will be:

Appeal denied.

All Justices concurring.